CHARLES B. RIPLEY et al., Individually and as Stockholders of INTERNATIONAL RAILWAYS OF CENTRAL AMERICA, Suing in Behalf of Themselves and All Other Stockholders, Similarly Situated, Respondents-Appellants, *v.* INTERNATIONAL RAILWAYS OF CENTRAL AMERICA, Respondent-Appellant, and UNITED FRUIT COMPANY, Appellant-Respondent.

First Department, June 23, 1959.

*Theodore Kiendl* of counsel (*Porter R. Chandler, Edwin J. Jacob* and *A. Brooks Wilder, Jr.,* with him on the brief; *Davis Polk Wardwell Sunderland & Kiendl,* attorneys), for appellant-respondent.

*T. Roland Berner* and *Aaron Lewittes* (*Julian S. Bush, M. Victor Leventritt, Shirley D. Brinsgfield* and *Sidney Bender* with them on the brief), of counsel for Charles B. Ripley and others, respondents-appellants.

*Herman A. Bayless* (*Waite, Schindel, Bayless & Schneider* with him on the brief), of counsel for Peter G. Thomson, Jr., and others, respondents-appellants.

*Alexander Kahan* (*Harry Bijur* with him on the brief), of counsel for Carl C. Lang and another, respondents-appellants.

*Bijur & Herts* for John A. Bonaudi, respondent-appellant.

*Louis H. O. Fischman* for Morris Gross, respondent-appellant.

*Inzer B. Wyatt* of counsel (*Sullivan & Cromwell,* attorneys), for International Railways of Central America, respondent-appellant.

VALENTE, J.   In this derivative action brought by a group of minority stockholders of International Railways of Central America (hereinafter referred to as '' IRCA ''), a judgment was entered, upon a decision of a Referee, (1) directing the defendant, United Fruit Company (hereinafter referred to as '' UFCo '') to pay to IRCA the sum of $4,531,055.38 — representing damages to IRCA and unjust enrichment to UFCo for the period ending December 31, 1955; (2) declaring the rates to be paid on shipments over IRCA facilities after December 31, 1955; and (3) giving leave to apply at the foot of the judgment to determine the amounts of payments to be made by UFCo after December 31, 1955.

UFCo has appealed from that judgment; and contends that the complaint should have been dismissed.   Plaintiffs and IRCA have cross-appealed, urging that the dollar amount of restitution directed by the Referee is too small and should be increased to $65,300,000, and that the rates fixed for shipments after December 31, 1955 are unfairly low.   In view of the inordinate size of the record and the extensive briefs, it will be impossible in this opinion to discuss all of the contentions and arguments of the parties although they have been fully considered by the court.*

IRCA, a New Jersey corporation, owns and operates a railroad system in Guatemala and San Salvador.   Its railroads in

---

* The record of the trial before the Referee consists of approximately 26,000 pages of stenographic minutes, some 6,000 documentary exhibits, 300 printed pages of the Referee's report and supplemental report and 500 pages of printed findings of fact and conclusions of law. The printed briefs submitted on this appeal run to over 2,000 pages. Additionally, the argument of the appeal has been transcribed into 227 pages of typewritten material.

Guatemala connect the principal parts of the country with each other and with the Atlantic and Pacific seacoasts. UFCo, also a New Jersey corporation, has extensive banana plantations in Guatemala, some in the eastern and others on the Pacific slope around Tiquisate, operated by UFCo's subsidiary, Compania Agricola de Guatemala (hereinafter called "Agricola"). This litigation is concerned, in essence, with a progressive series of long-term contracts under which IRCA transported UFCo bananas, as well as imports of goods and materials into Guatemala, for UFCo's plantations. The principal contracts under review were made in 1936, at which time UFCo owned 17% of the IRCA stock. Immediately thereafter, UFCo became the owner of 42.67% of the voting stock of IRCA, and to this date maintains that position.

The gravamen of plaintiffs' case is that UFCo by virtue of its stock ownership in IRCA, and other means, dominated and controlled IRCA so as to secure for UFCo unfairly low freight rates for its banana and import traffic.

The original complaint, served in 1949, was sustained by this court in *Ripley* v. *International Rys. of Cent. America* (276 App. Div. 1006). We then held that the six-year Statute of Limitations would bar any recovery for transactions occurring before February 14, 1943. We also gave defendants permission to plead the three-year Statute of Limitations, in the event that evidence at the trial might show that particular transactions fell within it. An amended complaint was served in 1951. Defendants' motion addressed to the sufficiency of the amended complaint was denied by Mr. Justice RABIN in April, 1952 (*Ripley* v. *International Rys. of Cent. America,* N. Y. L. J., April 3, 1952, p. 1333, col. 1).

Trial was begun before Justice HAMMER at Special Term. When Justice HAMMER retired under the mandatory age requirements, the parties to this litigation stipulated to have Justice HAMMER continue with the trial as a Referee to hear and determine. The Referee, after handing down his report and making findings of fact and conclusions of law, denied a motion by UFCo to reopen the case. UFCo's notice of appeal brings up for review, not only the judgment entered in December, 1957 but also the Referee's refusal to reopen the case, and a portion of the order of April, 1952 which denied defendant's motion for partial summary judgment based on a defense of the three-year Statute of Limitations.

At the trial defendant IRCA — on whose behalf the action was brought — opposed the plaintiffs and supported the position of UFCo in resisting the suit. Counsel for IRCA assert that its

position at the trial was dictated by the fear that a money judgment against UFCo, based on higher rates than provided in the contracts, might terminate the agreements. In the light of the decision of the Referee, IRCA re-examined its position, and as a result, appeared in this court as a cross appellant from the judgment below on the ground that the damages awarded against UFCo are inadequate.

The issues on this appeal involve the soundness of the Referee's decision on the following matters:

(1) Domination and control of IRCA by UFCo; (2) Demand or futility of demand, by stockholders of IRCA, upon its board of directors to sue; (3) Fairness of the rates and transactions between UFCo and IRCA; (4) Legal power in IRCA, under Guatemalan law, to charge more than 20 cents per stem for the transportation of bananas; (5) Defenses of Statute of Limitations; (6) Defenses based on section 61 of the General Corporation Law; (7) Adequacy of damages — presented on the cross appeals by plaintiffs and IRCA; and (8) Limitation of relief as to damages to December 31, 1955, the power to fix rates after that date, and the reservation of the right to apply at the foot of the judgment for fixing of damages thereafter.

## (1) *Domination and Control.*

The Referee found that plaintiffs had sufficiently established that UFCo exercised such domination over IRCA that in effect it was bargaining with itself when the basic 1936 contracts were negotiated and executed.

The relationship between UFCo and IRCA began in 1904, when one Minor C. Keith — who had at one time owned three fifths of the stock of UFCo but who had sold all but about 10% of the stock to raise money to invest in IRCA — acquired control of the Guatemala Northern Railroad and a large tract of undeveloped tropical jungle in Guatemala which was ceded to the railroad by the Guatemalan government. By the agreement of 1904, UFCo received 50,000 acres of the undeveloped jungle and undertook to plant approximately 5,000 acres of bananas within four or five years. IRCA was to afford the means for the expeditious transportation of UFCo bananas. In the 1904 contract, IRCA gave UFCo various special privileges and preferences which were not to be afforded to anyone else without UFCo's permission. Moreover, IRCA obligated itself not to encourage directly or indirectly any competition to UFCo in Guatemala and to give UFCo detailed reports on the movement by IRCA of bananas for any other shipper. UFCo has urged that the provisions of the 1904 contract in respect to precautions

against potential competitors violated no law of Guatemala and were designed simply to furnish UFCo with the protection it considered essential before entering into a new and extremely hazardous business.

There were modifications of the 1904 contract in 1913 and 1920. By 1928, Keith, because of financial involvements, turned over his stock interest in IRCA to bankers, UFCo and other stockholders under a voting trust agreement.

The 1936 contracts govern the basic relations between the parties to this suit from 1936 to date. Under those contracts, UFCo agreed to purchase 185,000 shares of IRCA's unissued common stock and 3% notes at a par value of $1,750,000. Through Agricola, its subsidiary, UFCo paid IRCA $2,165,000 in cash, agreed to purchase 10 new locomotives and 300 banana cars for IRCA, and undertook, for a period of 20 years, not to build a port on the west coast so as to insure the movement of the produce from the newly opened west coast banana lands over IRCA's rail lines to east coast ports. The cash received from Agricola was to be used to redeem 6% first mortgage collateral notes.

In a separate agreement, trackage rights were granted Agricola to operate its banana trains over IRCA's lines, with priority over all other traffic, except passenger trains, for a period of 25 years at a flat charge of $30 per banana car. This charge included the use of all IRCA's facilities at Barrios, the east coast port. In another separate agreement, IRCA undertook to operate Agricola's trains and to maintain Agricola's locomotives and rolling stock; and Agricola was to reimburse IRCA for the costs incurred. But in another separate agreement, Agricola contracted to reimburse IRCA at a flat rate of $30 per car for the expense so incurred, less the amortized cost of the new equipment purchased by Agricola at the rate of 5% for depreciation and 4% interest. When the equipment was totally amortized, it was to remain on IRCA's lines for use by Agricola until Agricola determined it no longer needed it, in which case IRCA could then use it for any desired purpose.

The agreement also contained a clause providing for adjustment in rates upon a change in price " effecting the costs and charges of producing, acquiring, selling and transporting Guatemalan bananas ". In the event the parties could not agree on such adjustments, there was provision for arbitration. It was under this adjustment clause that UFCo and IRCA agreed in 1948 to increase the payment for a banana car to $75, and by the end of 1952 to raise the price to $90 per car.

The findings as to domination and control of IRCA by UFCo are abundantly supported by the evidence. Certainly, viewed as a practical matter, there was unquestionable control during the period of the shipments for which recovery was sought in this action. Little significance can be attached to the absence of stock ownership in IRCA by UFCo in the 1904–1928 period. The fact is that UFCo officials and directors acted and sat as IRCA officials and directors from the inception of IRCA. The cessation of the ostensible interlocking of officers and directors did not alter the underlying influence. Apart from outward appearances, control was, as a practical matter, completely effectual. (See *Southern Pacific Co.* v. *Bogert*, 250 U. S. 483, 492; *Globe Woolen Co.* v. *Utica Gas & Elec. Co.*, 224 N. Y. 483.)

There was no necessity for a majority stock ownership. Domination, before 1928, extended to all phases of IRCA's railroad business. The Referee found that Pollan — a Special Advisor to IRCA — was " one of the most important means through which United exercised practical control and domination over IRCA ". Pollan became Special Advisor in 1932, and was in regular attendance from then on. Evidently, no matter of importance to UFCo was ever resolved contrary to Pollan's advice.

The acquisition by UFCo in 1936 of 185,000 shares of voting stock of IRCA — giving UFCo 42.67% of the stock — cemented the control. UFCo's stock constituted the majority of all shares actually voted at IRCA's annual meetings for the election of directors since 1938. The stock ownership thus became insurance against changes in directors and also guaranteed a continuance of management satisfactory to UFCo. (See *Gratz* v. *Claughton*, 187 F. 2d 46 [C. C. A. 2d], cert. denied 341 U. S. 920.)

The general attorney of UFCo was a director, and from time to time, the legal advisor of IRCA. The executive vice-president of UFCo was the special advisor of IRCA. He sat with the directors of IRCA without vote and advised executive and administrative officers of IRCA. His advice was uniformly followed. When Pollan was special advisor, and sat with the IRCA board, he undoubtedly was the most influential person attending the meetings. At the same time he was second in command at UFCo. His predecessor as advisor, Chittendon, had also been a high official in UFCo.

There was also an integration of IRCA's operations into that of UFCo with an interchange of personnel, common engineering departments, use of UFCo's legal department by IRCA, common use of purchasing departments, and representation of IRCA by UFCo officials before governmental bodies.

Because of this practical control, UFCo stood in a fiduciary relationship to IRCA with respect to business transactions between them. (*Everett* v. *Phillips,* 288 N. Y. 227; *Blaustein* v. *Pan American Petroleum & Transp. Co.,* 293 N. Y. 281.) Thus contracts fixing shipping rates become suspect and must be carefully scrutinized since they obviously were dictated by the controlling corporation. Where a divided loyalty exists, as it clearly did here, it becomes incumbent on the controlling corporation to justify the fairness of any transactions which are questioned. (*Chelrob, Inc.* v. *Barrett,* 293 N. Y. 442; *Geddes* v. *Anaconda Mining Co.,* 254 U. S. 590.) The existing relationship precluded any possibility of genuine arm's length bargaining between IRCA and UFCo. Under the circumstances, in view of the domination and interrelationship, directors of IRCA could not have exercised an unbiased, reasonable judgment in fidelity solely to IRCA. While there was an attempt to give a verisimilitude of complete independence and separation between the companies, the realities presented a case of complete domination. That stubborn fact cannot be dissipated by ingenious, but unconvincing, arguments.

(2) *Demand or Futility of Demand.*

UFCo claims that plaintiffs failed to prove either a demand and refusal to sue or that such a demand would have been a futile gesture.

It is questionable whether UFCo may raise this defense since IRCA does not press it. Such a defense appertains to IRCA; it cannot have any bearing on the cause of action asserted on behalf of IRCA against UFCo. Certainly, the alleged wrongdoer ought not to be able to dictate whether the injured corporation or minority stockholders in a derivative capacity should bring the suit. (*Koral* v. *Savory, Inc.,* 276 N. Y. 215.)

In any event, there was sufficient evidence to warrant an inference both of demand and futility of demand. The demand can be spelled out of the conferences held, before suit was brought, between IRCA officials and some of the plaintiff stockholders and their attorney. At that time, IRCA officers knew that the stockholders were seeking action by IRCA to obtain more remunerative rates from UFCo, and that if no action was taken, a stockholders' suit would be instituted.

Demand to sue need not assume a particular form nor need it be made in any special language. The refusal by IRCA, after those conferences, to take affirmative steps was not based on the exercise of discretion or business judgment. It displayed

but another aspect of the domination and control by UFCo. (*Koral* v. *Savory, Inc., supra*, p. 220.)

It is equally obvious here that demand upon the directors of IRCA to sue UFCo, in connection with the acts and transactions complained of in the instant action, would have been a useless and futile act. (*Sage* v. *Culver*, 147 N. Y. 241, 246; *Delaware & Hudson Co.* v. *Albany & Susquehanna R.R. Co.*, 213 U. S. 435, 451.) No fair and honest consideration of such a demand could have been anticipated under the circumstances; nor could there be any reasonable expectation of any just and vigorous prosecution of a suit. The IRCA board was under the influence of UFCo with respect to the causes of action which could be asserted against UFCo. All of the directors of IRCA in office in 1948–1949 had either participated in, or authorized, the acts and transactions about which complaint was being made, or had ratified such acts. A demand is excused where the directors have knowingly participated in the transactions involved. (*Brinckerhoff* v. *Bostwick*, 88 N. Y. 52; *Loewenstein* v. *Diamond Soda Water Mfg. Co.*, 94 App. Div. 383.)

Where an antagonistic position is demonstrated, stockholders have the right to remove the matter from the hands of management and bring an action in a representative capacity. (*Chaplin* v. *Selznick*, 186 Misc. 66, 68.) Since futility of demand was shown by the evidence establishing interest or bias on the part of the directors, plaintiffs were entitled to proceed with the action. Surely, we would not compel them to entrust the prosecution of such an action in the hands of persons who would be opposed to the success of the suit. (See *Wile* v. *Burns Bros.*, 239 App. Div. 59.)

(3) *Fairness of Transactions.*

The Referee found that the rates paid by UFCo to IRCA for various types of traffic were unfair and unconscionable and directed additional payments to be made by UFCo, amounting to $4,531,055.38, for the period up to December 31, 1955. The damage items covered, in the main, three categories: (1) banana shipments from the west coast to Guatemala; (2) banana shipments from the east coast (Bananara); and (3) shipments of imports to the west coast.

UFCo urges that the contracts under which it operated with IRCA were fair and that the Referee had no power to revise them. Further, it argues that the Referee had no power to fix traffic rates and, moreover, in doing so, did not consider all the factors which went into the determination of the contract prices between IRCA and UFCo.

Because of the fiduciary relationship between UFCo and IRCA, UFCo had the burden of showing "fairness" of the transactions between the parties. (*Geddes* v. *Anaconda Mining Co.,* 254 U. S. 590, 599, *supra,* cited with approval in *Chelrob, Inc.* v. *Barrett,* 293 N. Y. 442, 461–462, *supra.*) UFCo claims that the contracts are fair when not only the tariff rates are considered, but when all of the other relevant factors are weighed — such as, essential financing, use of railroad equipment, availability of connecting carrier facilities, reduction of terminal services, assurances of stable and substantial traffic volume, and covenants by UFCo not to create competing facilities.

The Referee undoubtedly considered all those factors in applying some "amelioration" from the rates paid by independent shippers.

UFCo's attempted justification of the low, special rates it received was not convincing. It did not meet its burden by entangling the low rates with other values which it did not have the power to give, and which were not susceptible of any adequate determination.

The Referee seems to have found that the fair value of IRCA's services to UFCo was what others would pay for comparable services in arm's length bargains. Obviously, this was not a case where rates were to be fixed as in the ordinary Interstate Commerce Commission rate case. So, too, there was no standard by which the Referee could measure, with any precision, the value of the alleged other advantages which UFCo claimed to have given IRCA.

Some of the alleged considerations which UFCo urged as material have no basis whatsoever. Much is made by UFCo of an alternative available to it, if contracts were not made with IRCA, of building a port on the west coast at Concepcion. There is basis in the evidence for the inference that all the talk of a proposed port at Concepcion was a mere sham to give some validity to the low rates being exacted from IRCA. The Referee properly concluded that UFCo had rejected the notion of a port on the Pacific as economically unattractive in view of the availability of IRCA's substitute facilities. Also correct was the finding that UFCo's promise not to build a port at Concepcion without IRCA's consent was of no practical value to IRCA.

It is mere speculation, without any supporting proof, to argue that a Pacific port would have spelt ruin to IRCA. It is noteworthy that the mention of a Pacific port is absent from all of the extensive documentary evidence of the period culminating in the 1936 contracts.

So, too, the various other considerations which UFCo advances for the depressed rates do not hold water. For example, there is the claim of essential financing. Apparently, such financing was extended in order to have UFCo consolidate its control over IRCA by the purchase of 185,000 shares of stock in 1936. The stock was bought to prevent IRCA from falling into the hands of competitive interests.

Moreover, the assertion that over a period of time UFCo advanced funds for the acquisition of locomotives and special banana cars to be operated and maintained by IRCA must be viewed against its proper background. The equipment arrangement was foisted on IRCA for the purpose of concealing from independent shippers the true rate relations between IRCA and UFCo. UFCo retained the right of first use of the equipment. The secret agreement to make it appear that Agricola was supplying its own cars and locomotives for shipment of bananas from Western Guatemala was part and parcel of the plan to stifle competition.

The Referee's conclusion as to the unfairness of the rates was a fair inference from the evidence. Full consideration was given to all of the other intangible benefits which IRCA may have received by application of the doctrine of " amelioration " in fixing the amount of damages.

(4) *Right to Charge More Than 20 Cents Per Stem.*

UFCo advances a contention, which was asserted for the first time in 1955, that IRCA may not legally charge more than 20 cents per stem for the transportation of bananas to Barrios from any point on its lines in Guatemala. This 20 cents' limitation is said to derive from IRCA's original concession from Guatemala in 1904, which expressly limited the maximum charge for hauling bananas to 20 cents per stem, regardless of the distance traveled. The Referee found that the 20 cents' limit applied only east of Guatemala City.

It should be noted that at no time up to 1955 did UFCo or its lawyers have any doubt about IRCA's right to charge more than 20 cents. It fact, during the period involved in this suit, UFCo itself paid from $60 to $90 per car for the transportation of bananas, while other shippers paid $130. (These prices compare with $58.20 which would be the rate per average car load of 291 stems at the 20 cents' rate.)

There can be no doubt about the correctness of the Referee's determination on this point. The 20 cents' maximum applied only to the line between Barrios and Guatemala City. As to its

Pacific lines, IRCA was empowered to apply the maximum tariffs of the Pacific concessions — which had been those of the old Guatemala Central Railroad. Those Pacific concessions had maximum freight tariffs on a weight per mile basis, and not per stem. Since 1912, IRCA had consistently applied the Pacific concessions maxima to the Pacific lines, without question by anyone.

A proper interpretation of the first concession of 1904 is that it concerned the railway *east* of Guatemala City. That concession contained a provision for maximum freight rates as to bananas at 20 cents gold per bunch. Since the concession dealt only with the operation of that line between Barrios and Guatemala City, the price restrictions as to maximum charges can have reference only to hauls between those cities.

The Guatemalan Government — which would be the only one really interested in a breach of the concession — has made no complaint. Certainly neither the Referee, nor this court, could find that the Government of Guatemala was wrong in permitting IRCA to exercise the concession granted in the manner in which IRCA did, and was derelict in not calling a halt to charges over 20 cents per bunch. We cannot undertake to make inquiry into the acts of a foreign sovereign. In any event, the more reasonable conclusion is that the 20 cents' maximum did not apply to Pacific bananas. Hence, this defense is completely insupportable.

Apart from the objections as to timeliness and as to the procedural sufficiency of UFCo's motions to reopen the case on the question of the 20 cents per stem limitation, we agree with the Referee that the proffered new evidence would not have affected the result. As already indicated, the argument of UFCo that Guatemala law limits IRCA to 20 cents per stem for transportation, regardless of the length of haul, was properly rejected.

(5) *Statute of Limitations.*

UFCo contends that the Statute of Limitations runs from the execution of the contracts here under attack and bars any recovery with respect to payments made under those contracts.

This court passed upon the defense as addressed to the original complaint (*Ripley* v. *International Rys. of Cent. America*, 276 App. Div. 1006, *supra*). We directed a dismissal of that portion of the original complaint relating to matters alleged to have occurred before February 14, 1943 on the basis of the six-year statute; but we gave leave to defendants to plead the three-year Statute of Limitations in the event that the evidence at the trial developed that any transactions fell within it.

Later, Mr. Justice RABIN, at Special Term (N. Y. L. J., April 3, 1952, p. 1333, col. 1, *supra*) upon defendants' motion for partial summary judgment based on the three- and six-year statutes, dismissed the amended complaint " to the extent that it seeks dismissal of any matter occurring prior to February 14, 1943 ", dismissed it with respect " to all matter in the [amended] complaint, other than that which concerns preferential banana export rates " insofar as it seeks recovery for the period prior to August 2, 1945, and denied the balance of the motion without prejudice to defendants' pleading the three-year statute. Defendants did not appeal from that order and now seek to review it under section 580 of the Civil Practice Act.

In addition to pleading the three-year statute, defendants were permitted by the Referee to add, as an alternative plea, the two-year limitation prescribed by Guatemalan law. Under section 11 of the Civil Practice Act the applicable " periods of limitation * * * must be computed from the time of the accruing of the right to relief by action ". This means " the time when the plaintiff first became enabled to maintain the particular action in question ". (*Cary* v. *Koerner,* 200 N. Y. 253, 259.) By virtue of the practical control of and domination over IRCA, we have affirmed the finding that UFCo stood in a fiduciary relationship to IRCA. The obligations stemming from that relationship are governed by the equity principles applicable to fiduciaries. The obligation to pay a fair price, being derived from fiduciary principles and not from principles of contract law, does not depend on the availability of any remedies arising from contract law. By virtue of the law of fiduciary obligations, IRCA is entitled to hold defendant UFCo accountable for the value of the services over and above the amount already paid. (*Chelrob, Inc.* v. *Barrett,* 293 N. Y. 442, *supra*; *Fulton* v. *Whitney,* 66 N. Y. 548; Restatement, Restitution, § 152.) Breaches of the obligation occurred with each shipment and the payment of inadequate rates. It follows, therefore, that payments for shipments antedating the six-year period before commencement of the action are excluded, while those occurring within the six-year period are not barred. Plaintiffs' cause of action is in the nature of one for money had and received by unjust enrichment in which the six-year statute applies. (*Dentists' Supply Co.* v. *Cornelius,* 281 App. Div. 306, affd. 306 N. Y. 624.)

The inapplicability of the two-year Guatemala statute (Civ. Code of Guatemala, art. 1063 [1]) rests upon two separate reasons. In the first place, the cause of action asserted by

plaintiffs is one for unjust enrichment as a consequence of the breach of fiduciary obligations by UFCo to IRCA arising from control and domination by UFCo. That fiduciary obligation is determined by the laws of the State of incorporation of IRCA. (*Upson* v. *Otis*, 155 F. 2d 606 [C. C. A. 2d]; see, also, *German-Amer. Coffee Co.* v. *Diehl*, 86 Misc. 547, affd. 168 App. Div. 913.) Since the main offices of both companies were in the United States, their boards of directors met in this country, and most of the acts in which domination and control were asserted occurred here, it is patent that plaintiffs' causes of action did not arise in Guatemala.

Under section 13 of the Civil Practice Act, the limitations of the laws of the State or country where the cause of action arose may be applied, except where the cause of action originally accrued in favor of a resident of this State. Since the cause of action did not arise in Guatemala, UFCo may not enlist the two-year Statute of Limitations of that country.

In the second place, there was a conflict in the testimony of the experts on both sides as to whether article 1063(1) of the Civil Code of Guatemala embraced the type of action sued on here. Under the Civil Code actions prescribed in two years are those for fees, salaries, wages, personal emoluments, and other compensations for the rendering of any service.

The testimony of plaintiffs' expert, Professor de Vries, established that article 1063(1) of the Civil Code of Guatemala comprehends only contract actions and has no bearing on suits for unjust enrichment. Moreover, even if the instant action could be considered as one in contract under Guatemala law, it is not the type of contract included in article 1063(1). Quite obviously, the contracts referred to in article 1063(1) are those comprising claims by servants, employees, artisans and professional men for agreed payments for services rendered.

Reliance by defendants on *Henis* v. *Compania Agricola de Guatemala* (116 F. Supp. 223 [U. S. Dist. Ct., Del., 1953], affd. 210 F. 2d 950 [C. C. A. 3d]) as having decided the question of the application of the Statute of Limitations adversely to plaintiffs, is wholly misplaced. Primarily, it must be noted that the United States Court of Appeals, in that case, in affirming the dismissal did so on the ground of the absence of a qualified stockholder plaintiff, and expressly said it was unnecessary to consider the question of limitations.

The *Henis* case was a minority stockholders' derivative suit brought on behalf of IRCA in March, 1953, after the present case had been set for trial. UFCo was not a defendant; but Agricola

was. Nor was any plaintiff in the present action a party there. Apart from the fact that the District Court was passing on the Delaware Statute of Limitations, Judge LEAHY deliberately refrained from deciding the issues in the present suit for he pointed out that his dismissal of the Delaware suit was not prejudicial to full litigation of the issues in the pending New York action. Moreover, the cause of action there dismissed was entirely different from that in the instant suit. The Referee properly determined that *Henis* was not controlling here.

(6) *Defenses Based on Section 61 of the General Corporation Law and Ratification.*

Under section 61 of the General Corporation Law, it must appear in a stockholders' action that the plaintiff was a stockholder at the time of the transaction of which he complains.

Out of the 27 plaintiffs, 25 acquired their stock after April 30, 1945. Only two of the plaintiffs were stockholders in 1936, namely, Liddell and Waterman. As to those two, section 61 would not bar recovery. Neither would any defense of ratification bar their prosecution of this suit. While the 1936 contracts were announced to all stockholders, the stockholders were not informed of UFCo's control over IRCA nor were they informed of the other circumstances regarding discrimination against other banana traffic, nor the agreements regarding the maintenance of the Agricola equipment. There having been no full disclosure to stockholders, the members present at the meeting as well as those who voted by proxy are not bound by their assent to the contracts. Since, as the Referee held, there was a failure to make full and frank disclosure to the stockholders, there is no basis for a claim of ratification or that the stockholders slept on their rights.

Certainly, the stockholders, Liddell and Waterman, did not approve the alleged unfair rates at any time nor the transactions in suit (shipments at inadequate rates after Feb. 14, 1943). As to the other 25 plaintiffs, the continuing nature of the wrongs did not bar their participation in the action for underpayments of shipping rates after they became stockholders.

The defenses of ratification and section 61 of the General Corporation Law, therefore, were properly dismissed.

(7) *Adequacy of Damages—Cross Appeals by Plaintiffs and IRCA.*

On their cross appeal, plaintiffs argue that the Referee committed error in failing to award full restitution by the fiduciary without regard to any '' amelioration ''. Moreover, it is urged

that the Referee should have decreed payment of the profit UFCo made from the investment of the moneys withheld from IRCA, and that interest at 6% instead of 4% should have been allowed. (The Referee did allow 6% interest from the date of his decision.) Under plaintiffs' theories, IRCA should have received an additional $65,300,000.

In effect, plaintiffs claim that in the three categories of (1) banana shipments from Western Guatemala; (2) banana shipments on the east coast (Bananera shipments); and (3) imports by Agricola shipped to Western Guatemala, the least plaintiffs were entitled to were the rates fixed per carload for other shippers — which would have increased plaintiffs' recovery by approximately $36,000,000.

There is no point in extending this opinion by indicating the calculations upon which plaintiffs rest their contentions. It is urged that the Referee should have considered comparisons of rates of other railroads, the costs of IRCA attributable to panana traffic and the price increases in bananas.

The error in plaintiffs' whole theory is in equating this case with a railroad rate-fixing matter. While some of the principles in that type of proceeding may have relevancy, the situation confronting the Referee in the instant case was *sui generis*. The Referee was not called upon to fix a tariff rate as a governmental agency might, but to determine whether the contractual relationship between IRCA and UFCo was a fair one, and if not fair, to what extent the fiduciary had been unjustly enriched at the expense of the *cestui* corporation.

In arriving at a resolution of that question the Referee was not only entitled to, but was bound to consider all of the circumstances and not treat the fixing of a fair price as if he were operating as an Interstate Commerce Commission Commissioner. While the considerations which UFCo advanced as completely justifying the low rates IRCA gave to UFCo, were not, as has been shown hereinabove, sufficient to meet the test for fiduciary fairness they were relevant in arriving at a determination as to the extent of the unjust enrichment.

It was these intangible benefits which IRCA undoubtedly received in the course of its dealings with UFCo which called for what the Referee appositely termed " amelioration ".

While IRCA was entitled to fairness of dealing, it would have been equally inequitable for the Referee to employ unfair standards to decree the measure of restitution. Quite obviously, the trier of the facts was confronted with a problem that could not be solved with any mathematical certainty. The over-all

picture had to be surveyed including the vista of future oper-
ations between the companies.

In a sense what the Referee has done is to reach a point in
the rates which in his mind, had they been paid during the period
in question, would have impelled a court of equity to stamp
them as fair had stockholders complained.

As to the claim of 6% interest, instead of 4%, plaintiffs admit
that the amount of interest is within the sound discretion of the
court. The Referee fixed 4% because that was the rate charged
by the parties in their dealings, and the Referee found that rate
to be fair and reasonable. There is no basis for disturbing the
Referee's conclusion in this discretionary matter.

The plaintiffs' claim for additional awards must be denied.

(8) *Limitation of Relief to December 31, 1955. Reservation
of Right to Apply for Damages Thereafter at Foot of
Judgment.*

The plaintiffs limited their claim for damages to December
31, 1955. The Referee, accordingly, found no specific amount
of damages for 1956 and later years. Hence, the judgment with
respect to the dollar amount of recovery is restricted to ship-
ments antedating 1956.

The judgment not only fixes the dollar amount of damages
sustained by IRCA by virtue of the unfair rates paid by UFCo
up to December 31, 1955, but also determines the rates to be
applied after December 31, 1955 until the termination of the
contracts. The increased rates are to continue in the ratios
indicated " until the rates and charges are equal to the same
or similar rates promulgated and charged " by IRCA to the
general public. Thus, after December 31, 1955, UFCo is to pay
15⅓ cents per stem for export bananas from eastern points;
it is to pay $120 per car for west coast bananas for the period
from January 1, 1956 to December 31, 1956; $125 per car from
January 1, 1957 through December 31, 1957, and $130 per car
after January 1, 1958. As to import shipments after December
31, 1955, IRCA is to receive a 10% increase and 10% annually
until the public tariff rate is reached.

Provision is made for applying at the foot of the judgment
for damages in respect to shipments after January 1, 1956 based
on the rates so fixed, leaving open to the parties the right to
submit further evidence only of any substantial deterioration
after 1955 in economic conditions.

It is claimed that the Referee exceeded his jurisdiction in
making any disposition of rates after December 31, 1955, since,

in effect, he was thus reforming the contracts between the parties.

Upon argument of the appeal, the attorneys for the respective parties were asked if the parties wanted the contracts cancelled after December 31, 1955, and the answers can be interpreted as assent to rescission. These *ex post facto* decisions, however, should not be given much weight and should be judged against the background of the Referee's disposition of the case. The assent to a rescission comes much too late, since the pleadings as amended contain no request for such relief. The case was tried on the basis of the fairness of the rates in the contracts considering the fiduciary relationship of UFCo to IRCA. None of the parties asked the Referee to rescind the contracts because of unfairness.

It should be noted that the possibility of a change in rates under the contracts was envisioned by the terms of the contracts. The Referee pointed out that the 1936 contracts provided that either party had the right " from time to time during the term of this contract * * * to make written request to the other for reconsideration of the rates of payment provided " on the basis of maintaining " an equitable adjustment " of the cost of producing bananas and the costs of providing transportation for such bananas. Any disputes were to be submitted to arbitration. The effect of the Referee's determination is the implementation of these provisions for an " equitable adjustment " of charges. The Referee's judgment as to prospective rates can be justified as falling within the equitable powers of a court. While neither side has presented any decision squarely in point, where a court has not only fixed past damages but set a rule of conduct for future prices under an existing contract, the absence of any precise authority poses no insuperable impediment.

Primarily, it must be recognized that the determination as to fair rates for the period before December 31, 1955 was inextricably woven with the fixation of future charges. The Referee was making an equitable adjustment for the full period of the contract. As the Referee said: " An immediate larger payment by way of the damages suffered might have been required by strict law rules of damage. Equity, however, appeared to require some amelioration. Accordingly, a ratio of increases from the inequitable, unfair and unjust low to the determined proper amounts to be paid over the periods of time fixed was stated in the decision. Equity thus adjusted the rights and relationship of the parties as of the date of the judgment to be entered with the view within reason of preserving between

U. F. Co and I. R. C. A., whose transportation situation in Guatemala was and is vitally interdependent, friendly and co-operative business relations.''

A court of equity is not hampered by the restrictive and inflexible rules which govern common-law courts. (See 1 Pomeroy, Equity Jurisprudence, § 116.) The extent of equitable relief is not a matter of fixed rule. (*Virginian Ry.* v. *Federation,* 300 U. S. 515, 551.) Moreover, having assumed jurisdiction a court of equity will grant complete relief and will mould its decree to satisfy the requirements of the case. The flexibility of equitable jurisdiction permits innovation in remedies to meet all varieties of circumstances which may arise in any case.

The instant suit combines the elements of declaratory judgment action, of a suit to compel a fiduciary to account, and of an action to recover unjust enrichment. To do complete equity and to decide all of the disputes between the parties in order finally to dispose of the litigation, it is apparent that a decision as to unfairness of rates up to a certain point of time would only invite immediately another suit to determine the same issues for the subsequent period. The effect of the Referee's decision herein is to declare the rights of the parties under their existing, and subsisting, contracts and to give judicial imprimatur to what would be considered fair rates in a transaction in which one of the parties has been held to occupy a fiduciary relationship to the other. A decree merely adjudicating the extent of the unjust enrichment or the amount which the fiduciary was to disgorge, without at the same time setting a standard for future conduct, would lack the element of finality expected from a court of equity. The necessities of the instant suit demanded the utmost flexibility in the moulding of the decree. Apart from analogy with declaratory judgment actions, we can compare the decree herein with one giving instructions to a trustee as to future dealings with a *cestui*. Under the circumstances, the judgment, in setting standards for the remaining period of the contract, was a proper exercise of equitable discretion amply supported by the exigencies of this case.

In the judgment, jurisdiction is reserved to enter at the foot of the judgment such further directions or orders as may be appropriate or proper to supplement the damages therein awarded and to obtain other relief. However, the judgment provides that '' such motions or applications shall be made to the present Referee herein (or if for any reason he is incapacitated from serving, to a Special Term of the Supreme Court, New York County) ''.

We find no authority for the attempt by the Referee to reserve to himself personally jurisdiction to hear and determine future controversies between the parties. Since the judgment indicates the rule for fixing rates after 1956 and the type of evidence deemed necessary for applying the rule, there was no necessity for a reservation of power by the Referee to implement those provisions. Any such implementation at the foot of the judgment should be accomplished at the Special Term of the Supreme Court, where too, the other incidental relief to protect the judgment may be obtained.

In summary, we agree that plaintiffs clearly established a case of domination and control of IRCA by UFCo, which imposed upon UFCo a fiduciary obligation to treat fairly with IRCA. The evidence was convincing that the rates charged by IRCA to UFCo and Agricola were not fair to IRCA under all of the circumstances. Hence, IRCA was entitled to be recompensed for the unjust enrichment of UFCo, the fiduciary, at the expense of IRCA. In arriving at the measure of damages, the Referee was entitled to weigh all of the relevant considerations and was not constrained to apply strict rate-fixing policies. The quantum of damages awarded by the Referee fairly weighed the ameliorative considerations, and we find no sound basis for complaint by plaintiffs.

The defenses urged by UFCo as to illegality of charges over 20 cents per banana stem, as to Statutes of Limitations, as to ratification and as to failure to make a demand, were properly dismissed by the Referee.

Except for the reservation of the power by the Referee personally to hear and determine applications at the foot of the judgment, we have found no substantial error requiring a reversal or modification of the judgment herein.

The judgment should therefore be modified on the law to the extent of eliminating that portion thereof which purports to reserve to the Referee jurisdiction to hear and determine applications at the foot of the judgment and otherwise affirmed with costs to respondents.

The orders of the Referee entered on January 12, 1957 and December 19, 1957, respectively, denying defendant-appellant's motions to reopen the hearings before the Referee have been reviewed on the appeal from the judgment. The order of Mr. Justice RABIN entered June 24, 1952, insofar as it denied defendant-appellant's motion for partial summary judgment dismissing portions of the amended complaint, which has been brought up for review pursuant to section 580 of the Civil Practice Act, should be affirmed.

330

Breitel, J. P., M. M. Frank, McNally and Stevens, JJ., concur.

Judgment unanimously modified on the law to the extent of eliminating that portion thereof which purports to reserve to the Referee jurisdiction to hear and determine applications at the foot of the judgment and otherwise affirmed, with costs to respondents. The orders of the Referee entered on January 12, 1957 and on December 19, 1957, respectively, denying defendant-appellant's motions to reopen the hearings before the Referee have been reviewed on the appeal from the judgment. The order of Mr. Justice Rabin entered June 24, 1952, insofar as it denied defendant-appellant's motion for partial summary judgment dismissing portions of the amended complaint, which has been brought up for review pursuant to section 580 of the Civil Practice Act, is affirmed.

Settle order on notice.