**LAIRD et al. v. UNITED SHIPYARDS, Inc., et al.**

No. 261, Docket 20575.

Circuit Court of Appeals, Second Circuit.

Aug. 13, 1947.

Writ of Certiorari Denied Dec. 15, 1947.
See 68 S.Ct. 264.

---

Tanzer & Mullaney, of New York City (Robert P. Weil, of New York City, of counsel), for appellant.

Rogers & Condon, of New York City (John F. Condon, Jr., of New York City, of counsel), for appellee United Shipyards, Inc.

Proskauer, Rose & Paskus, of New York City (Joseph M. Proskauer and J. Alvin Van Bergh, both of New York City, of counsel), for defendants-appellees Rogers and Powell.

Mudge, Stern, Williams & Tucker, of New York City (Henry Root Stern and Milton Black, both of New York City, of counsel), for appellee Chase Nat. Bank of City of New York.

Before CHASE and CLARK, Circuit Judges, and RIFKIND, District Judge.

CHASE, Circuit Judge.

Appellant Laird, and another who took no active part in the trial below and who has not appealed, brought this suit on September 18, 1940 in the District Court for the Southern District of New York. Federal jurisdiction resting entirely upon diversity is clear and unquestioned. The plaintiffs, who will hereinafter be called the appellant, sued in their derivative right as stockholders of defendant United Shipyards, Inc., to recover promoter's secret profits alleged to have been made by the defendants Rogers and Powell, with the connivance of some or all of the other defendants, by their receipt of 4,400 shares of preferred stock when the predecessor of defendant United was organized; and to have a constructive trust impressed upon shares of stock which defendants, other than United, then obtained. An accounting for additional profits arising from what was called the Alderton mortgage transaction was originally sought but that has been abandoned and is not a part of this appeal.

After trial on the merits, the court found that there had been no overreaching by the defendants and entered a final judgment for them from which this appeal was taken. It also held that the confirmation of a plan under which the corporation was reorganized in 1934 in proceedings under Sec. 77B, Bankr.Act, 11 U.S.C.A. § 207, was res judicata and left undecided the issue raised by the defendants by pleading the New York statute of limitations as a bar.

Though the facts are rather complicated, the following summary will suffice as the background for the legal conclusion which will, in our judgment, dispose of the entire controversy.

In 1928 appellee Powell with Rogers, who was Powell's attorney, and Aldred who died after this suit was brought and whose executors were substituted as parties, were interested, with others, in consolidating under one ownership and management all of the six large companies then engaged in building and repairing ships in the harbor of New York. These companies were the Morse Dry Dock & Repair Company, Staten Island Shipbuilding Company, W. & A. Fletcher Company, Theo. A. Crane's Sons Company, James Shewan & Sons Inc., and New York Dry Dock Corporation. In September and October of that year Powell obtained in his own name options to purchase the properties of five of the above companies and one Farley, who was associated with the Morse interests, secured an option upon the remaining one. The purpose was to have the options exercised by a corporation to be formed with funds to be raised by the sale of its stock to a banker's syndicate which would offer the stock at public sale. The options as originally taken called for the payment in the aggregate of $18,424,000 in cash for all six properties and the assumption of two existing mortgages which may be disregarded for present purposes. However, no bankers were found who would undertake to provide that much but a banking group was willing to buy for public resale 450,000 shares of the new corporation's common stock for $9,000,000 provided only $6,550,000 of this money was used to purchase the properties and the remainder was kept available for working capital. This method

of financing the new corporation made it necessary to obtain the consent of the optioners to modify the option provisions. After a long period of negotiation, all of the optioners did consent to revisions of their options which in sum and substance made it possible to acquire all the properties for $6,550,000 in cash, $8,500,000 in purchase money mortgages, and $3,850,000 in stock consisting of 17,750 shares of the new corporation's preferred having a par value of $1,775,000 and 103,750 shares of its common having no par value, taken at an agreed value of $2,075,000.

· While some of the optioners were willing to take stock and mortgages as the equivalent of cash, not all could be so satisfied. In the case of W. & A. Fletcher Co., however, all cash was eliminated. The revised terms called for a substantially increased price payable partly in · stock with the remainder secured by purchase money mortgage. But in the case of James Shewan & Sons, Inc., all cash to the amount of $3,-100,000, as originally provided, was insisted upon until it was finally agreed that the option should be for cash only in addition to a purchase money mortgage of $1,300,-000 and 4000 shares of the 6%. preferred stock of the new corporation. But this was upon the condition that the optionee, Powell, would find a purchaser for the mortgage for cash equal to its face amount, the option providing that the payment be made at the closing of title, "against proper instruments of transfer and the 4000 shares of 6% Preferred Stock mentioned above will be issued and delivered thereupon to the purchaser of said mortgage." In the case of Theo. A. Crane's Sons Co., the original option called for the payment of $2,227,800 in cash. The revised option provided for the payment of $2,200,00 of which $650,000 was to be cash, $800,000 was to be secured by a purchase money mortgage and the remainder was to be $375,000 of the 6% preferred stock of the new corporation and 18,750 of its common shares. The revised option contained the following clause: "Said Powell and/or assigns will if requested in writing so to do by the undersigned ten days prior to the date of closing of title, · purchase from the undersigned at the closing of title a prior interest in the said ten year mortgage to an amount not exceeding 50 per cent thereof, namely $400,000 * * *". The request was seasonably made. The new corporation, called United Dry Docks, Inc., was organized under the laws of New York on December 13, 1928 by Powell, Rogers, Aldred and members of the banking group which was to buy its stock for public resale. Powell, Rogers and Morse, who was president of Morse Dry Dock & Repair Co., became its original officers and directors with one Bates as vice-president. In 1929 additional officers and directors were elected. The board of directors authorized the granting of an option to Wiggin, Aldred and Hoyt, who were acting for the banking group, on 450,000 of the common shares of the corporation at $20.00 per share. This option was given on January 10, 1929' and assigned by the optionees to Hayden, Stone & Co., Minsch, Monell & Co. Inc., and Pynchon & Co., of the banking group. They formed a syndicate to underwrite the shares at $20.25 and each underwriter was to receive one option warrant for each four shares underwritten entitling the holder to buy one common share of United on or before December 31, 1933 at $20. The defendant Chase Bank, which was a large secured creditor of the W. & A. Fletcher Co., then in receivership, was designated to take and hold for the account of the syndicate the 450,000 common shares the latter was to buy and to issue interim certificates to the purchasers of shares offered to the public.

The options were duly assigned to United and on the closing date the following occurred: The Chase Bank paid, in behalf of the syndicate, $9,000,000 to United and the 450,000 common shares were issued to it to hold as above. No other purchaser having been found, Rogers and Powell purchased the $1,300,000 mortgage on the Shewan properties for $1,300,000 in cash and the 4,000 shares of United preferred stock was issued to them. They also purchased a one-half prior interest in the $800,000 mortgage on the Crane properties for $400,000 in cash. As part of the consideration for so doing 400 preferred shares of United were issued to them. These purchases were made, after fruitless attempts to find other

purchasers, to enable United to take up the options, and the trial court found that:

"The said 4,400 shares of United Preferred were issued in good faith for a good, valid and valuable consideration, with the knowledge by all of the parties then interested in United as to the purpose and destination of the shares so issued."

"At the time of acquisition of the Shewan mortgage and the interest in the Crane mortgage by defendants, Rogers and Powell, there was no profit to said purchasers at the expense of United or at the expense of anyone then interested or about to become interested in United."

"Defendants, Powell and Rogers, realized no secret profit as a result of the Shewan and Crane transactions, and the acts of Rogers and Powell in connection with the Crane and Shewan transaction was carried on in good faith. * * *"

The cash which Rogers and Powell used to buy these mortgages, and thereby to become entitled to the stock, was obtained by them as a loan from the Chase Bank negotiated a few days before the closing date. They later paid that loan.

Previous to the closing date, the syndicate had issued a prospectus and offered the common stock it had underwritten for sale to the public. It was sold and the subscribers received interim certificates issued by the Chase Bank. On January 17, 1929, the appellant bought 100 of United's common shares from a member of the selling group of bankers and in due course received an interim certificate which he held without taking up the stock for about seven years and until after the reorganization of United on May 5, 1936.

The fair hope that United would be successful was dashed by the crash in the fall of 1929. It merely struggled along in the face of adversity until its reorganization. It emerged from those proceedings as United Shipyards, Inc., the present defendant. Rogers and Powell had used the 4400 shares of preferred as part of the collateral they deposited with the Chase Bank to secure their above mentioned loan, and at the time of reorganization the shares were so held by the Bank. They were converted into B shares of United Shipyards, Inc., and were sold by the Bank at the request of Rogers and Powell for $41,672 and the amount realized applied on their loan. This was about $9 a share for the original $100 par value preferred.

After the reorganization and the outbreak of World War II a good sale of all the properties of the reorganized corporation was made and the amount thus realized doubtless became the financial incentive for bringing this suit.

The Chase Bank was alleged to have aided in the breaches of fiduciary duty charged to Rogers and Powell as above set forth, it being argued that it was an insufficiently secured creditor of the W. & A. Fletcher Co., and thus moved so to do, though that was neither found nor proved.

We find it unnecessary to set forth in greater detail either the facts found or the claims made by the respective parties for in our opinion the New York statute of limitations is a bar to the suit.

There was no allegation or proof of fraud of the kind which is found in Reno v. Bull, 226 N.Y. 546, 550, 124 N.E. 144. Such fraud must necessarily be pleaded and proved to establish a cause of action on which, by virtue of Sec. 48(5) of the Civil Practice Act, the statute does not begin to run until discovery. Hastings v. H. M. Byllesby & Co., 293 N.Y. 404, 57 N.E.2d 733. Consequently, there was no coupling of an allegation of such fraud with an allegation of a breach of fiduciary duty to make Mannaberg v. Klausner, 294 N.Y. 859, 62 N.E.2d 487 applicable. Here we have but a suit on the derivation of a corporation whose fiduciaries, it is alleged, have committed breaches of their duty to it. It has been proved and found that at the time such alleged breaches of duty occurred all parties then having any interest in, or holding any position of responsibility to, the corporation were fully aware of all the facts. That was no later than February 28, 1929 and then the alleged cause of action accrued. Hastings v. H. M. Byllesby & Co., supra; Lever v. Guaranty Trust Co., 262 App.Div. 1044, 30 N.Y.S.2d 532, affirmed 289 N.Y. 615, 43 N.E.2d 837. Nor is the statute tolled because those alleged to have been derelict in their duty were in

control of the corporation. Hastings v. H. M. Byllesby & Co., supra.

It may be that the trial judge did not base his decision upon this ground because Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231, had not then been decided. That case now shows conclusively that the New York statute of limitations does apply. That statute, as construed by the New York courts, had run before this suit was brought.

Judgment affirmed.