**INTERNATIONAL RAILWAYS OF CENTRAL AMERICA, Plaintiff-Appellant,**

v.

**UNITED FRUIT COMPANY, Defendant-Appellee.**

**No. 178, Docket 30638.**

United States Court of Appeals Second Circuit.

Argued Nov. 29, 1966.

Decided Jan. 27, 1967.

Aaron Lewittes, New York City (Leventritt, Bush, Lewittes & Bender, New York City) (M. Victor Leventritt, Sidney Bender, Abraham K. Weber, New York City, of counsel), for plaintiff-appellant.

Ralph M. Carson, New York City (Davis, Polk, Wardwell, Sunderland & Kiendl, New York City) (Porter R. Chandler, Robert F. Dobbin, New York City, of counsel), for defendant-appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

This action was brought on February 16, 1965, by International Railways of Central America (IRCA) against United Fruit Company (UF) in the District Court for the Southern District of New York. The complaint, analyzed in more detail below, asserted six claims, the first four and the sixth seeking treble damages for breach of the antitrust laws, 15 U.S.C. § 15, and the fifth, predicated on the same facts as the third, primarily seeking damages for breach of contract. The asserted damages, going back in some instances to 1928, when trebled were in excess of a half billion dollars.

UF moved for summary judgment (1) dismissing the first, second, fourth and sixth claims and so much of the third and fifth as related to matters occurring before 1961, on the ground that their prosecution was barred by the final judgment awarding damages through December 31, 1960, in a derivative action brought in the New York courts by stockholders of IRCA (hereafter "the Ripley action") against that company as a nominal and UF as the real defendant; and (2) dismissing so much of the claims (other than the fifth insofar as it was based on alleged breach of contract) as related to matters occurring before February 16, 1961, as barred by the four-year statute of limitations for antitrust actions, 15 U.S.C. § 15b. Plaintiff countered with a motion for partial summary judgment as to UF's liability on the first, second, fourth and sixth claims and also as to damages on the second and sixth, mainly on the basis of the record and judgment in the Ripley action. Judge Ryan granted both branches of UF's motion and denied plaintiff's, 254 F.Supp. 233 (1966). A judgment was entered which made the recitals appropriate under Rule 54 with respect to the grant of defendant's motion and contained certification under 28 U.S.C. § 1292(b); we granted leave to appeal so that the entire matter might be before us.

I.

A statement, necessarily condensed, of the relations of the parties and of previous litigation is essential to understanding. For the former we draw largely on the findings made by the referee in the Ripley action in 1957, which were affirmed by the hierarchy of New York courts.

IRCA operates the most important railroad in Guatemala, running across the country from Puerto Barrios on the Caribbean, the principal seaport, with one branch veering southward into El Salvador and another extending from western Guatemala north to the Mexican border. From its incorporation in 1904, IRCA's fortunes were closely linked to UF's banana business in Guatemala, initially in the east. The importance of the two companies to each other increased when, in the 1920's, UF became convinced of the desirability of expanding its plantations around Tiquisate in western Guatemala.

In 1928 a syndicate including UF and banking firms purchased the interest of IRCA's dominant shareholder, Minor C. Keith, this making UF, with 71,000 shares of common stock, the largest single shareholder. The stock purchased by the syndicate was placed in a voting trust under which UF, through a trust company as its agent, nominated two of the five trustees. In fact UF took over control of IRCA, although its stock owner-

ship was concealed. By the mid-1930's its interest in western Guatemala and consequently in IRCA increased; its new president, Zemurray, made known that UF would pursue its development plans only if its control of IRCA was solidified, for the double purpose of insuring continuation of the favorable freight rates and service on its own products and of preventing similarly favorable rates to competitors. In 1936, Compania Agricola de Guatemala, S. A. (Agricola), a wholly owned subsidiary of UF, acquired 185,000 shares of unissued IRCA common stock at a low price and the voting trust was dissolved. UF's 256,000 common shares then constituted 42.68% of IRCA's total voting stock, 500,000 shares of common and 100,000 of preferred. At the same time contracts relating to rates and many other matters were executed.

From this time UF could and did control the election of IRCA's nine directors, although it regularly allowed the banking interests to submit four nominees for its approval. UF's control was exercised even more potently by the designation, from 1928 on, of the officer in charge of its tropical operations as "special adviser" to IRCA's board, chairman and president. For many years, the extent of UF's stock ownership and dominance of IRCA was concealed.

As indicated, UF's most important interest in IRCA was in having low freight rates and special services for its own products and in denying these to its competitors. On banana shipments from western Guatemala, UF for many years paid only $60 per car, performing the wharfage service and loading at Barrios with its own labor, whereas independents paid $130 per car for the line haul and

about $72 for wharfage and loading, on which IRCA made a profit. For bananas from eastern Guatemala, UF was charged 11½ or 12 cents per stem as against 20 cents for independents. On imports through Barrios to western Guatemala IRCA charged the public $350 or more per carload as against $60, later $100, to UF. In numerous instances IRCA, at UF's instance, denied to independents services comparable to those furnished its controlling stockholder.

In May, 1948, meetings were held between an attorney representing IRCA stockholders, and the President and Chairman of the Board of IRCA, to consider IRCA-UF relations and rates. When the conferences proved unproductive, Ripley and other stockholders represented by the attorney brought a derivative action in the Supreme Court, New York County, in February, 1949. A year later the Appellate Division sustained the complaint except for such portions as related to matters occurring before February 4, 1943, which were held to be barred by the six-year statute of limitations. Ripley v. International Railways of Central America, 276 App.Div. 1006, 95 N.Y. S.2d 871 (1st Dept. 1950). After service of an amended complaint, denial of a motion challenging its sufficiency and extensive discovery, trial was begun in 1953 before Mr. Justice Hammer and, after his retirement, was continued before him as a referee.

In a long report and decision, filed in June, 1957, the referee concluded that plaintiffs had established a breach of fiduciary duty by UF. He fixed rates for the carriage of the bulk of UF's traffic at considerably more than what IRCA had collected but less than those charged to independents.[1] Although at the trial

---

1. For west coast bananas he directed that the $75 per car rate voluntarily made effective in January, 1948 should be applied retroactively to January 1, 1946, that the rate for 1948 should be $80, and that this should rise $5 annually through 1955. For east coast bananas he directed that the 15⅓ cent per stem rate which had applied from 1920 to 1930 should be restored from 1943 through 1955. For import traffic he directed an increase of 10% per car for 1947 and for each year thereafter through 1955. As to other items, he found plaintiffs had not adequately proved damages. He expressed the opinion that "equity and fair dealing indicate, and no doubt would require, similar annual rateable increases" for the cross-country traffic "until the rates equal those fixed for the general

IRCA had opposed the plaintiffs and supported UF, because of fear that judgment for the plaintiffs might enable UF to terminate the complex of contracts executed in 1936, the referee's conclusion as to the severability of the rate arrangements led it to join plaintiffs in appealing on the ground that the award of damages was inadequate. The Appellate Division rejected this argument as it did the many grounds urged by UF for reversing the award to IRCA, Ripley v. International Railways of Central America, 8 A.D.2d 310, 188 N.Y.S. 2d 62 (1st Dept. 1959), and the Court of Appeals affirmed, 8 N.Y.2d 430, 209 N. Y.S.2d 289, 171 N.E.2d 443 (1960). On March 1, 1961, the Supreme Court for New York County entered a supplemental judgment assessing damages for 1956–60 in the sum of $3,309,670.39, with interest.

In preparing for and conducting the trial of the *Ripley* action, an attorney for the plaintiff stockholders became aware of evidence which in his view demonstrated antitrust violations by UF, and mentioned this to a Justice Department attorney toward the end of 1951. In 1954, the United States filed a civil complaint under the antitrust laws against UF in the Eastern District of Louisiana. This action terminated early in 1958 in a consent decree, one section of which required UF to dispose of its IRCA stock not later than June 30, 1966. In January, 1962, UF sold substantially all such stock to BSF Company which in turn sold the great bulk of this to Trans Caribbean Airways; the latter has purchased additional stock so that it owns 340,000 of IRCA's 500,000 shares of common. Later, UF advised it was abandoning Tiquisate and would no longer ship bananas from western Guatemala over IRCA as the latter claimed it was bound to do through 1967. IRCA then sought the advice of attorneys who had been of counsel to the *Ripley* plaintiffs. This action followed, on February 16, 1965.

We conclude this history with a summary statement of the six claims in the complaint:

*First:* loss of revenues and permanent damage to IRCA from UF's repressive tactics which prevented other banana shippers from using IRCA, 1928–61, $75,000,000.

*Second:* utilizing IRCA to facilitate UF's monopolistic designs by granting it discriminatorily low rates, 1928–61, $55,-000,000 less the principal paid on the state court judgment.

*Third:* restricting UF's own banana shipments over IRCA, 1949–64, and disposing of its banana plantations in the Tiquisate area for other uses beginning in 1961, $24,000,-000.

*Fourth:* monopolization of water transportation of Guatemalan coffee to the United States on a basis whereby total charges via Barrios were equalized with those from west coast ports of Guatemala and whereby IRCA was forced to charge higher rates on coffee not using UF ships, depriving IRCA of higher rail revenues it could have obtained if there had been effective steamship competition, 1928–61, $15,000,000.

*Fifth:* breach of contract to ship west coast bananas (damages included in third claim).

*Sixth:* acquisition of control of IRCA by UF in violation of § 7 of the Clayton Act, 15 U.S.C. § 18 (damages equal to aggregate alleged in first four claims).

public, (or so-called independent), shippers." The judgment entered December 19, 1957, translated these figures into dollar amounts aggregating $4,531,055.38, including interest, established rates from January 1, 1956, in accordance with the above, and contained an appropriate reservation of jurisdiction for the future.

The total damages asserted, which may well contain some duplications, amounted to $169,000,000 and, when trebled, to $507,000,000.

## II.

We consider first the defense of the four-year statute of limitations for antitrust actions, 15 U.S.C. § 15b, which Judge Ryan sustained save as to the claim for breach of contract. IRCA asserts that the statute did not start to run on any of the antitrust claims until UF relinquished its domination in January, 1962, even though most of the facts had been spread on public records long before, and that the action, brought in February, 1965, was thus timely. UF responds that "domination" as a basis for tolling the statute with respect to an antitrust claim ceases to apply to a corporation once the facts giving rise to the action have become known to independent directors or stockholders since they can bring a derivative action for treble damages on the corporation's behalf, as held in Fanchon & Marco, Inc. v. Paramount Pictures, Inc., 202 F.2d 731, 36 A.L.R.2d 1336 (2 Cir. 1953). It contends that this condition was here met as to stockholders not later than the annual meeting in March, 1952, when, after a thorough and heated airing of many of the claims being advanced in Ripley, an opposition slate received some 204,000 votes as against 308,000 for the management and as to directors in 1959 when three "independent" directors were elected to the IRCA board.[2] Plaintiff, not disputing that sufficient knowledge of the claims existed long before 1961, replies that it would be anomalous to bar the corporation because of a stockholder's or director's failure to do what the former was not bound to do and what neither might be able to do. Pointing to the thirteen years of starvation diet for the stockholders' lawyers in the Ripley action, it stresses the serious practical obstacles to undertaking derivative litigation against a powerful defendant, particularly one controlling the corporation, without the sinews afforded by the corporate treasury.

The closest that the Supreme Court has come to dealing with this vexing problem is Curtis v. Connly, 257 U.S. 260, 42 S.Ct. 100, 66 L.Ed. 222 (1921). This was a suit in equity by the receiver of a national bank against former directors for losses sustained by the payment of dividends out of capital and by improper loans and investments. The suit was brought August 2, 1916, and the six defendants whose liability was at issue had resigned by early 1910. Mr. Justice Holmes considered the suit to have been brought "upon the common-law right of the bank to recover for acts that diminished its assets," 257 U.S. at 262, 42 S.Ct. at 100,[3] and accordingly treated the case as governed wholly by the Rhode Island statute of limitations without considering possibly more extensive federal principles. The applicable Rhode Island statute was for six years with a proviso that "[i]f any person, liable to an action by another, shall fraudulently, by actual misrepresentation, conceal from him the existence of the cause of such action, said cause of action shall be deemed to accrue against the person so liable therefor, at the time when the person entitled to sue thereon

2. The three, Cunningham, Ruckle and Yaeger, were elected May 27, 1959, and remained as directors until 1963. Ruckle, a New Jersey automobile dealer who had owned a substantial amount of IRCA stock since 1954, was invited by McGovern of UF to have his name on the management slate for 1959; so apparently was Cunningham. The record does not show the circumstances as to the nomination and election of Yaeger who had been on the opposition slate at the stockholders' meeting of 1952; however, in view of the absence of cumulative voting, it is inferable that he too was on the "management" slate even though known to be hostile to UF.

3. We are not clear why this was so, since the bill apparently alleged acts constituting federal claims under Rev.Stat. § 5239, see the decision of the District Court, Curtis v. Metcalf, 259 F. 961, 963–964 (D.R.I. 1919), and Chesbrough v. Woodworth, 244 U.S. 72, 78–79, 37 S.Ct. 579, 61 L.Ed. 1000 (1917), but we take the opinion as we find it.

shall first discover its existence." The somewhat anthropomorphic view that "The bank, of course, must be charged with knowledge of what appeared upon its books," 257 U.S. at 262–263, 42 S.Ct. at 101, disposed of the claims of concealment of illegal investments and, apparently, also of illegal dividends. The only point further discussed was the carrying of loans on the books at inflated values, as to which the "bank" itself would not perceive the error since the entries tallied with the amount of the loans and the concealment was simply the weakness of the borrower's credit. As to this, notice was found in the election of three new directors between 1909 and early 1910 who came to the board, admittedly with knowledge of the facts, "as the eyes of the bank." 257 U.S. at 264, 42 S.Ct. at 101. The Supreme Court's opinion did not discuss, although those in the lower courts had, "the contention made, not with much apparent confidence, that the statute did not begin to run in favor of the retiring directors until the bank passed into the control of a board, the majority of whom had not participated in the wrongs alleged against the retiring members * * *." Curtis v. Connly, 264 F. 650, 652–653 (1 Cir. 1920); see also Curtis v. Metcalf, 259 F. 961, 964–966 (D.R.I.1919). Examination of the briefs in the Supreme Court discloses that the appellant's argument on this score went not to domination as such but rather to knowledge. "Three-fifteenths of a board of directors," it was urged, "is not enough to make their knowledge tantamount to knowledge by the bank." Although the domination issue thus was raised by the facts, the Supreme Court seems not truly to have focused upon it; and while the decision must be taken into account, we do not consider it nearly so conclusive in defendant's favor as did the district judge.

The three precedents in this Court that have been cited to us [4] do not assist decision much further. In Michelsen v. Penney, 135 F.2d 409, 415 (2 Cir. 1943), an action by depositors and a receiver of a national bank against directors, we said that "the statute is tolled while a corporate plaintiff continues under the domination of the wrongdoers", and found that to be true until the receiver's appointment. But the directors other than Penney were "legally unqualified dummy directors," see 41 F.Supp. 603, 610 (S.D. N.Y.1941), and it was for that reason that the court, shifting at this point to a theory of concealment, concluded that "notice should not be imputed to the bank, because all these new directors were elected by the controlling Penney group, many of them were lent qualifying shares by this group, and none of them were independent in any real sense." 135 F.2d at 416, n. 2. In Austrian v. Williams, 103 F.Supp. 64 (S.D.N.Y.1952), an action by the reorganization trustee of Central States Electric Corporation against directors and others, Judge Weinfeld found that Williams' domination of Central States, as to which see his review of the facts, 103 F.Supp. at 71–75, "was so pervasive that it effectively prevented the proper institution of actions against him and the directors liable with him." Id. at 115. Since this sentence was followed by the statement, "The nature and extent of the domination was such as effectively to conceal by its very existence the significant facts of the transactions under attack", it is not clear whether Williams' domination alone would have been considered enough under the circumstances, and this court's view as to the inapplicability of federal principles made it unnecessary to resolve that issue here. Austrian v. Williams, 198 F.2d 697, 700–702 (2 Cir.), cert. denied, 344 U.S. 909, 73

4. We regard Laird v. United Shipyards, Inc., 163 F.2d 12, 15–16 (2 Cir.), cert. denied, 332 U.S. 842, 68 S.Ct. 264, 92 L. Ed. 413 (1947), as without relevance both because of the finding that at the time of the alleged breach of duty "all parties then having any interest in the corpora-

tion were fully aware of all the facts," and because the language "Nor is the statute tolled because those alleged to have been derelict in their duty were in control of the corporation," clearly referred to the New York, not the federal, rule.

S.Ct. 328, 97 L.Ed. 701 (1952).[5] In Moviecolor Limited v. Eastman Kodak Co., 288 F.2d 80, 88, 90 A.L.R.2d 252 (2 Cir.), cert. denied, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961), we again recognized "adverse domination" of a corporation as a basis for tolling the statute with respect to a federal claim, and characterized it as "an exception which, though sometimes bulked with concealment, in fact rests on grounds akin to undue influence or duress." However, we were not required to mark out the boundaries of the doctrine since we found the complaint "falls far short of" alleging control by the wrongdoers.

While the parties have cited many other federal decisions going in various directions, we see little to be gained by detailed analysis of them.[6] Many did not have to, or at any rate did not, distinguish between domination *qua* domination, i. e., as affecting the ability to sue, and domination as effecting concealment. None involved control by a single owner, as distinguished from a majority of more or less guilty directors some of whom might decide that their liability in a suit brought by the corporation would be less than their liability for not bringing one. Almost all were actions in behalf of depositors in insolvent national banks. In some ways that point operates in favor of tolling since it seems hard to charge such creditors with the failures of knowledgeable stockholders or the delinquencies of knowledgeable and independent directors; in other ways it operates against it, because in many cases the facts were known by National Bank Examiners, "the real

'eyes of the bank' " and the Comptroller of the Currency could "compel restitution, resignation, or a receivership." Hughes v. Reed, 46 F.2d 435, 442 (10 Cir. 1931).

 One principle emerging with some clarity is that a plaintiff who seeks to toll the statute on the basis of domination of a corporation has the burden of showing "a full, complete and exclusive control in the directors or officers charged." Payne v. Ostrus, 50 F.2d 1039, 1042, 77 A.L.R. 531 (8 Cir. 1931). Such control was found, for example, in Adams v. Clarke, 22 F.2d 957 (9 Cir. 1927), where all the directors were accused of wrongdoing and held a majority of the capital stock, and also in our *Michelsen*, case, supra. This principle must mean at least that once the facts giving rise to possible liability are known, the plaintiff must effectively negate the possibility that an informed stockholder or director could have induced the corporation to sue. And here we think IRCA fails.

 While the odds may have been against the likelihood that IRCA's board of directors would have authorized an antitrust action against UF between May 1959 and February 1961, the possibility can by no means be dismissed as negligible. By that time, only four of the old-time directors remained. One of the replacements, Yaeger, would have been highly responsive to a stockholder's demand, see note 2, supra, and this also seems likely as to two others, Ruckle and Cunningham.[7] Nor can we simply assume that the other directors would have been obdurate. While plaintiff cites the Referee's excoriation of the IRCA direc-

---

5. The opinion distinguished Michelsen v. Penney, supra, as expounding a "federal doctrine," 198 F.2d at 700, applicable to an action to enforce the liability of a national bank director, compare fn. 3, although the *Michelsen* opinion was by no means clear on that point, see 135 F.2d at 415, 416, n. 2.

6. A goodly number are cited in an elaborate footnote to the opinion in Michelsen, 135 F.2d at 416 n. 2. However, Judge Clark's law clerk failed him in one respect; the cases, other than Curtis v. Connly, cited

in support of the first sentence should be transposed to the second, and those cited under the second sentence should be transposed to the first.

7. Ruckle regularly gave information to aid Price, another IRCA stockholder elected a director in 1961, in a derivative suit claiming interference by UF with a program of dieselization of IRCA. The record also shows that in 1959 Ruckle, Cunningham and Price met with the attorney for Ripley to discuss the railroad's operation.

tors with whom he was concerned,[8] the very vigor of that then recent expression, its affirmance by the New York courts, the 1958 decree of divestiture in the Government's antitrust suit, and the legal implications of arbitrary refusal to bring an apparently justified suit would hardly have escaped the minds of the directors, and certainly not of counsel to whom they would surely have referred a stockholder's or director's request. See Baker & Cary, Corporations, Cases and Materials 470–71 (1959); cf. Wolf v. Barkes, 348 F.2d 994, 996 (2 Cir.), cert. denied, 382 U.S. 941, 86 S.Ct. 395, 15 L.Ed.2d 351 (1965). In this connection, we find considerable significance in the changed position taken by IRCA in the *Ripley* action where in 1958, after the Referee's decision, it urged that the judgment "should be supported and increased," to reflect the full difference between the rates to UF and to independents. While this could be dismissed as cheap insurance for the directors with no real harm to UF since IRCA was merely supporting a position the plaintiff-stockholders were taking anyway, it is equally reasonable to regard it as meaning that the directors, even before the election of the three independents, had come to recognize their duty to protect the corporation once the spectre of loss of the UF contracts had been dissipated. Taking everything into account,[9] we cannot conclude that a demand on the IRCA directors for the institution of a treble damage action between May 1959 and February 1961 by a stockholder or director would necessarily have been fruitless.[10] UF's control of IRCA thus was no longer "full, complete and exclusive" in the sense here relevant.[11] We

8. "It is difficult to consider with patience the lack of information, inquisitiveness, of prudent care, and of concern of these directors and principal managers of IRCA as testified to by themselves in respect of the very important items of rates and contracts and dealings between their own company, IRCA, and its principal customer-shipper, U. F. Co. These men, it is found, were otherwise as U. F. Co. states it 'upright and honorable men' of high standing and unblemished reputation. * * *"

9. The directors also could not have overlooked the risk of dislodgment despite UF's large stock interest. In the 1952 election five years before the Referee's findings in *Ripley*, the management slate received the votes of only some 51,000 shares other than the 256,000 owned by UF, the independents got some 204,000, and about 89,000 shares, or nearly 15%, did not vote. In an election that would have been featured by cries as to the majority's refusal to authorize a multi-million dollar suit against UF arguably called for by the *Ripley* findings and with no risks save the expense of litigation, a considerably larger total vote and an even greater proportion against the UF slate would have been likely. With 95% of the stock voting, UF would have had to retain the suffrage of 29,000 of the independent shares to prevail. Even assembling a respectable management slate would not have been easy under the circumstances.

10. While this issue is one on which plaintiff might have been entitled to take evidence, it raised no objection either in the district court or here to disposition of UF's motion on the affidavits and records submitted, and it has not adverted to any further evidence that might be introduced on this point.

11. IRCA cites Delaware & Hudson Co. v. Albany & Susquehanna R.R., 213 U.S. 435, 29 S.Ct. 540, 53 L.Ed. 862 (1909), which held that shareholders could bring a derivative suit without making the prior demands on management and the shareholder then required by Equity Rule 94 where a majority of the corporation's directors were officers or directors of the corporation alleged to have inflicted the injury, and the latter owned 22.9% of the injured corporation's stock. It argues that the question in that case was whether the plaintiffs could reasonably assume that management itself would not bring a suit in the corporation's interests when a majority of the board of directors was controlled by the prospective defendant; that the Supreme Court held in the affirmative; and that the question in this case is the same. Quite apart from the important distinction that only one of IRCA's directors in 1959 was an officer or director of UF, the problems are dissimiliar. The basis for barring a derivative suit without prior demand is simply the lack of reason for such an action if the corporation is willing to sue itself, a principle adopted for the benefit of

thus leave for another day the more difficult question whether or under what circumstances the mere possibility of suit by an informed stockholder or director would end tolling due to "domination" of a corporation by the alleged wrongdoer.

In upholding the partial defense of limitations in this case, we are thoroughly mindful that "[t]he treble-damage action was intended not merely to redress injury to an individual through the prohibited practices, but to aid in achieving the broad social object of the statute", Karseal Corp v. Richfield Oil Corp., 221 F.2d 358, 365 (9 Cir. 1955), and "for the purpose of multiplying the agencies which would help enforce the antitrust laws and therefore make them more effective." Kinnear-Weed Corp. v. Humble Oil & Refining Co., 214 F.2d 891, 893 (5 Cir. 1954), cert. denied, 348 U.S. 912, 75 S.Ct. 292, 99 L.Ed. 715 (1955). See United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954). But one may well question how far these policies would be furthered by a rule that would often permit the collection of treble damages accruing over decades and thus might seem rather an over-

kill.[12] Moreover, the statute of limitations itself embodies a strong policy "to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." Order of R.R. Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 348, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944). There could hardly be a better case for enforcing the policy than this, where UF has already suffered two judgments for its misdeeds and recovery of damages for more than three decades would result in a huge windfall to most of the present stockholders of IRCA and an unexpected loss to many innocent ones of UF.[13]

Since IRCA has not met its burden of demonstrating that, after the election of the three independent directors in 1959, UF had such "full, complete and exclusive control" as to rule out the possibility of a corporate suit against it, on the demand of a stockholder or director, for antitrust violations the facts giving rise to which had become well-known, any tolling of the statute ended at least by that time. In consequence the District Court properly held that all claims under the anti-

the very corporation that would profit from successful prosecution of the suit. We here enforce the important policy of the statute of limitations in protecting a defendant from stale claims; a court should require a clear showing before applying a judicially created exception. Although the question asked in the two situations thus may be formally the same, a plaintiff must go further in negating the possibility of suit by the corporation in the situation here *sub judice* since tolling the statute of limitations is far stronger medicine than dispensing with a demand as a condition to the bringing of a derivative action and will impinge upon different interests.

12. Indeed, disregard of the statute of limitations might impede efforts by the Government to obtain divestitures by consent. If UF had retained its stock ownership in IRCA, it would have shared *pro tanto* in any recovery from itself; a controlling stockholder may well be reluctant to sell, at a price reflecting only usual business considerations, if the corporation under new ownership can recover treble damages

reaching over decades. And there is surely some anomaly in a doctrine whereby although there could be no recovery against a former 100% stockholder, and a present 90% stockholder would suffer to the extent of only 10% of the amount recovered in a derivative action, 100% damages without limit of time could be obtained after a 90% stock interest was divested at a price in no way reflecting the claim.

13. Recovery of the damages sought, without taking account of income taxes, would amount to some $845 for each share of IRCA, and to some $62 per share of UF, currently selling around $31. While the *ad damnum* may be on the optimistic side and income taxes and deductions would cut the amounts roughly in half, the figures remain huge. Yet 68% of the common stock of IRCA is owned by a recent purchaser, and some notion as to how few of the minority stockholders date back to an early period is conveyed by the fact that of the 26 plaintiffs in the *Ripley* action, brought in 1949, only two had acquired their stock before 1945.

trust laws arising prior to February 16, 1961, were barred by limitations.

## III.

Our holding on the statute of limitations reduces the importance of the branch of UF's motion based on the rule against splitting a cause of action almost but not entirely to the vanishing point. With all claims prior to February 16, 1961, save so much of the fifth as concerns breach of contract,[14] barred by the four-year statute, the only remaining ones that would be excluded by the splitting rule are the antitrust claims relating to the period between that date and the dissipation of the effects of UF's control consequent on the sale of its stock in January 1962. Moreover, the second claim may have scant practical application to that relatively recent period in view of the provisions for rate increases in the *Ripley* judgment.

Starting from the doctrine that a plaintiff must recover all damages arising from given operative facts in a single action, Restatement, Judgments, § 62, defendant contends that the facts relied on by IRCA for recovery under the antitrust laws in this action are the same as those sued on by its stockholders in *Ripley*. Plaintiff disputes this; it claims that the rule against splitting is inapplicable when the first suit was brought in a forum which lacked power to give the relief sought in the second, thereby distinguishing such cases as Williamson v. Columbia Gas & Elec. Corp., 186 F.2d 464 (3 Cir. 1950), cert. denied, 341 U.S. 921, 71 S. Ct. 743, 95 L.Ed. 1355 (1951), Norman Tobacco & Candy Co. v. Gillette Safety Razor Co., 295 F.2d 362 (5 Cir.1961), and Engelhardt v. Bell & Howell Co., 327 F.

2d 30 (8 Cir.1964); and it argues that in no event should the rule be applied when a forum without power to give full relief was chosen not by the corporation now plaintiff but by stockholders forced to act in its behalf because of an unwillingness to sue dictated by the defendant, especially when they were ignorant of antitrust violations when the suit was brought.[15]

On the point of fact raised by the argument, the situation seems as follows: The gravamen of the *Ripley* complaint was the unduly and discriminatorily favorable rates accorded UF on its own shipments (the claim asserted as Second in the instant action) and the rate divisions on coffee exports and commodity imports; nothing in it can fairly be read as raising the claims now asserted as First or Fourth, and the Sixth is a different ground for the damage claims previously asserted. The proof, however, appears to have taken a wider range and the Referee made many findings relevant to what are now the First and Fourth claims, although he repeatedly made clear,[16] as did the New York Court of Appeals, that claims for violations of the antitrust laws were not at issue. See 8 N.Y.2d at 446, 209 N.Y.S.2d at 300, 171 N.E.2d 443. The *Ripley* plaintiffs did not seek a judgment for the loss of the traffic of independents. While they did request judgment in excess of $8,000,-000 for unfair divisions on export traffic, the Referee declined to grant any, evidently considering that the proof showed only that IRCA had been forced to reduce its own rates to meet truck competition.

To support its position that the action in the New York courts, which lack pow-

---

14. Although the District Court's judgment dismissed so much of the third and fifth claims as related to matters occurring before February 16, 1961, "on the ground of *res judicata*," this direction as to the fifth does not accord with the language or theory of the opinion, see 254 F.Supp. at 239.

15. Plaintiff also argues that when the *Ripley* action was brought in 1949, we had not yet decided Fanchon & Marco, supra,

202 F.2d 731, 36 A.L.R.2d 1336, holding that derivative actions for violations of the antitrust laws would lie, but we do not consider that point to have substance.

16. At the instance of counsel for UF, the Referee sustained objections to arguments and evidence which were relevant only to antitrust violations and not to breaches of fiduciary duty.

er to grant relief under the antitrust laws, could not preclude a later federal treble damage suit, plaintiff relies heavily on Judge L. Hand's well-known holding, in Lyons v. Westinghouse Elec. Corp., 222 F.2d 184 (2 Cir.), cert. denied, 350 U.S. 825, 76 S.Ct. 52, 100 L.Ed. 737 (1955), that a state court's overruling of an antitrust defense would not bar a federal suit for treble damages brought by the state court defendant. Defendant distinguishes this, as did the district judge, 254 F.Supp. at 237–238, on the basis that there it was the antitrust defendant, not the antitrust plaintiff, who invoked the state forum. Defendant further asserts that, whatever may be thought of plaintiff's distinction of *Williamson* and the other cases cited above, this cannot explain away our old decision in Straus v. American Publishers' Ass'n, 201 F. 306 (2 Cir.1912), appeal dismissed, 235 U.S. 716, 35 S.Ct. 197, 59 L.Ed. 438 (1914). Straus had first sued in a New York court under the state and federal antitrust laws for an injunction and damages with respect to an agreement to fix prices of books, and the Court of Appeals had held the agreement valid as to copyrighted although not as to uncopyrighted works. While Straus' appeal to the Supreme Court was pending, he sued in the district court under the federal antitrust act alone. This court held the state judgment conclusive, the opinion saying in one breath that the state court was without jurisdiction of the complaint founded on the federal statute and in the next that the "question was actually involved in the cause before the state court, which was competent to decide it." The Su-

preme Court later reversed the New York judgment on the merits, 231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192 (1913), making a remark equally hard for modern ears to understand: "This view of the case renders it unnecessary to decide whether an original action can be maintained in the state courts, seeking an injunction, and to recover damages under the Sherman Law." 231 U.S. at 237, 34 S.Ct. at 88.

The *Straus* case is not directly in point since it held the federal plaintiff barred not by failure to assert a federal claim in the state court but by the state judgment against him upon it. Even as to that, however, Judge L. Hand overruled *Straus* in denying a petition for rehearing in *Lyons,* supra, 222 F.2d at 195. We think it was well overruled even though, as defendant urges, it perhaps did not need to be in order to support the *Lyons* result.

■ Since what *Lyons* said in overruling *Straus* would necessarily mean that a judgment in favor of a state court defendant in an action seeking relief under the federal antitrust laws would not bar a subsequent federal suit,[17] it does seem hard to understand how a plaintiff's successfully suing in a state court on a claim that might have been but was not made the basis for antitrust relief can have a larger effect. Compare Restatement, Judgments, § 62, Comment on Clause (a), p. 255.[18] We find it unnecessary to decide this, however, since our ruling as to the statute of limitations brings the case to us in a posture, generally limited to damages suffered after February 16, 1961, quite different from

17. We do not deal here with a case where the jurisdiction of the state court was challenged and upheld by it, albeit erroneously. See Treinies v. Sunshine Mining Co., 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85 (1939); Alleghany Corp. v. Kirby, 340 F.2d 311, 312, n. 1 (2 Cir.), cert. granted, Holt v. Alleghany Corp., 381 U.S. 933, 85 S.Ct. 1772, 14 L.Ed.2d 698 (1965), dismissed, 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 (1966).

18. Section 62k of the Restatement suggests that where the plaintiff sues in a court

whose sovereign cannot or has not made available a court which can afford the plaintiff relief for his entire cause of action, there is no bar to a subsequent suit on the unredressed portion of that cause of action in the court of another sovereign which does afford such relief. This seems much closer to the case at bar than the rule of § 62j, relied on by the district judge, 254 F.Supp. at 238, which deals with a prior suit brought in a court of limited jurisdiction where the sovereign has made available another court with jurisdiction to grant all the relief sought.

that in which the issue was considered by the district judge. "On the whole, the principle against splitting is a salutary doctrine" but "inflexibly applied there can be little doubt that it results at times in unwarranted hardship." 1B Moore, Federal Practice ¶ 0.410[2] at 1169 (2d ed. 1965). It surely was not incumbent on the stockholders who brought the *Ripley* action in 1949 to recover all damages IRCA might sustain until the end of time from acts of UF of the sort there attacked, even those incurred after the period, through 1960, as to which proof of damages was made. Indeed, if the prior judgment had been in a federal treble damage suit by the corporation, it would not preclude recovery for subsequent antitrust violations. Lawlor v. National Screen Service Corp., 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955). The complaint should therefore not have been dismissed as to claims within the appropriate period of limitations.

### IV.

Plaintiff's appeal from the denial of its motion for partial summary judgment is without merit. Since the *Ripley* complaint did not and could not properly have asserted a claim under the federal antitrust laws, the judgment cannot have adjudicated that UF violated them; on this point the overruling of Straus, supra, 201 F. 306, by Lyons, supra, 222 F.2d 184, works for the defendant. The utmost effect the prior judgment could have had in this action on any view would thus have been as an estoppel on questions of fact actually litigated; and we need not now decide how far it would even have that. See Restatement, Judgments, §§ 68 and 71, and Lyons, supra, 222 F.2d at 195–196. With this action limited to damages after February 16, 1961, save on the contract claim which plaintiff does not contend to have been considered in *Ripley*, the role of the findings and judgment in the prior action is even more limited.

The judgment is affirmed insofar as it barred claims for damages under the antitrust laws accruing before February 16, 1961, is reversed insofar as it went beyond this, and is affirmed insofar as it denied plaintiff's motion for partial summary judgment. No costs.