**INTERNATIONAL RAILWAYS OF CENTRAL AMERICA,**
Plaintiff,

v.

**UNITED BRANDS COMPANY,**
Defendant.

**INTERNATIONAL RAILWAYS OF CENTRAL AMERICA,**
Plaintiff,

v.

**COMPANIA AGRICOLA de GUATEMALA, Defendant.**

**Nos. 65 Civ. 479, 72 Civ. 649.**

United States District Court,
S. D. New York.

Jan. 29, 1975.

Leventritt, Lewittes & Bender, New York City, for plaintiff.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants.

GURFEIN, Circuit Judge, Sitting by Designation:

This is an opinion after trial on the issues of liability alone. An earlier opinion on the motion for summary judgment by the defendants stated the history of the litigation between the parties and the claims in the present complaint. *International Railways of Central America v. United Brands Co. and Compania Agricola de Guatemala,* 358 F.Supp. 1363 (S.D.N.Y.1973).[1] The summary judgment motion was denied, but partial summary judgment was granted dismissing the antitrust claims for acts committed before February 16, 1961; and dismissing the contract claims against United Brands ("UB"), formerly United Fruit Company ("UF"), for breaches committed after December 31, 1962 (contract expiration date) and before January 1, 1961. With respect to breaches of contract claimed against Compania Agricola de Guatemala ("CAG"), they were dismissed if committed after December 31, 1962 (contract expiration date) and before October 9, 1962.

The case was tried to the Court without a jury with the applicable statutory recovery period for alleged antitrust violations designated as only from February 16, 1961; and for alleged contract violations against UB between January 1, 1961 and December 31, 1962.[2] De-

---

1. This opinion should be read in conjunction with the earlier opinion. The court also rendered a decision dated April 25, 1974, admitting in evidence certain findings of fact in the *Ripley* case, note 5 infra, and holding that they had a collateral estoppel effect as of December 31, 1955.

2. While the action against CAG was consolidated, CAG did not appear by separate counsel or offer any proof on its own behalf.

tailed findings of fact are being filed herewith.

To restate the issues briefly:

International Railways of Central America ("IRCA"), the plaintiff, was dominated for many years by UF which was its controlling stockholder and which also controlled its Board of Directors.[3] UF is, and has been, for more than half a century, in the business of producing, buying and transporting bananas for the purpose of importing them into the United States, as well as other countries. CAG, a wholly-owned subsidiary of UF, owned and operated banana plantations in western Guatemala in an area around Tiquisate. IRCA was a railway in Central America which, among other things, carried bananas in Guatemala from the east coast to the seaboard port of Puerto Barrios on the Atlantic Ocean for UF and from the west coast to Barrios for UF's wholly-owned subsidiary, CAG, as shippers.

As will appear, UF sold its stock in IRCA, save for 100 shares, in January, 1962.[4] The Guatemalan Government seized IRCA's assets in 1969 for alleged default on a Government loan. The corporate entity remained and is the present plaintiff.

The surviving antitrust claims in this litigation are:

*First Claim*: that UF's repressive tactics prevented *other* banana shippers from using IRCA's railroad facilities from February 16, 1961 to December 31, 1961, in violation of Sherman Act Section 1 (15 U.S.C. § 1).

*Third Claim*: that UF restricted its *own* banana shipments over IRCA from February 16, 1961 to 1964, and disposed of its Tiquisate banana plantations (on the west coast of Guatemala) in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

*Sixth Claim*: that acquisition of control of IRCA by UF was in violation of Section 7 of the Clayton Act (15 U.S.C. § 18).

### Earlier Proceedings

Beginning in February, 1949, certain shareholders of IRCA had begun a derivative suit against UF in the New York Supreme Court charging that UF had breached its fiduciary duty to IRCA.[5] In 1956, the Supreme Court so held and awarded a judgment for over $4.5 million for the period before 1956, and ordered an increase in freight rates prospectively to the termination of the contracts. In March 1961 a supplemental judgment awarded IRCA close to $4 million more, representing the increased rates from January 1956 through December 1960, which had been accrued but not yet paid pending the outcome of the appeal. The New York Court of Appeals affirmed the judgment, 8 N.Y.2d 430, 209 N.Y.S.2d 289, 171 N.E.2d 443, in 1960, and finally denied rehearing on February 23, 1961, 9 N.Y.2d 758, 214 N.Y.S.2d 1025, 174 N.E.2d 612. The full amount of the judgment was then paid.

After collecting the $8.5 million from UF, IRCA retained some of the able attorneys who had succeeded in the first action to sue in the Federal Court claiming antitrust violations and breaches of contract. The action was begun on February 16, 1965—four years after the fi-

---

3. The *Ripley* court found that IRCA was under the practical control of UF at least to 1955. This finding is accepted as collateral estoppel (issue preclusion). But its effect here does not go beyond 1955, more than five years before the statutory recovery period begins.

4. UF sold substantially all its IRCA stock to BSF Company which sold the great bulk of it to Trans Caribbean Airways, controlled by Roy O. Chalk. Trans Caribbean bought more stock so that it owned 340,000 of IRCA's 500,000 shares of common. This block was later sold by Trans Caribbean to one Yaeger who became Chairman of the IRCA Board and who retained present counsel to plaintiff.

5. *Ripley v. International Rys. of Central America and United Fruit Co.*, 8 A.D.2d 310, 188 N.Y.S.2d 62 (1st Dep't 1959), *aff'd*, 8 N.Y.2d 430, 209 N.Y.S.2d 289, 171 N.E. 2d 443 (1960).

nal order of the New York Court of Appeals.[6]

In the meantime, the United States had started a civil antitrust suit against UF in 1956 which resulted in a consent decree in 1958.

UF moved to dismiss the present claims as barred because of the prohibition against the splitting of causes of action and on the ground that they were barred by the statute of limitations. On the antitrust claims this court (Ryan, Ch. J.) dismissed the complaint, finding that there had been a splitting of the causes of action because "the facts presented to the New York court in the *Ripley* case were substantially the same as those presented by this litigation." 254 F.Supp. 233, 237 (S.D.N.Y.1966).

The Court of Appeals for the Second Circuit disagreed that there had been a splitting of the causes of action: "[s]ince the *Ripley* complaint did not and could not properly have asserted a claim under the federal antitrust laws [since the New York courts do not have jurisdiction to determine such issues], the judgment cannot have adjudicated that UF violated them." 373 F.2d 408, 419 (2 Cir. 1967), *cert. denied*, 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967). The Court of Appeals affirmed the District Court's finding that the statute of limitations barred suits for antitrust violations committed *before February 16, 1961*, which is the law of the case.

Six years after the Court of Appeals' decision, UF (now UB) moved for summary judgment as related above. On the antitrust claims it argued that IRCA had no standing to sue. In the opinion mentioned above, 358 F.Supp. 1363, this Court held, as indicated, that there were issues of fact to explore which prevented summary judgment for the defendant without a trial of the issues. The Court said:

"The gravamen of the present claim that survives the limitations defense is that UF then [after the *Ripley* decision] turned upon IRCA as reprisal for its insistence on the fulfillment of the *Ripley* judgment and aimed its antitrust violations at IRCA as a direct and prime target. It is said to have cut its banana production on the West Coast for the purpose of laying IRCA low, and to have restricted the use of its Tiquisate land for banana growing not only to thwart its potential competition but also for the avowed purpose of directly harming IRCA." 358 F. Supp. at 1372–73.

To understand this reference, a brief statement about Tiquisate is in order at this point. UF's subsidiary CAG operated banana plantations on the west coast of Guatemala in an area called Tiquisate from the 1920's to 1963 or 1964. All the bananas grown or purchased by CAG on the west coast were transported to Barrios via IRCA. The claim with respect to standing which was principally considered on the summary judgment motion, was that UF had deliberately abandoned Tiquisate in reprisal against the *Ripley* judgment and against IRCA's refusal to lower the freight rates provided therein.

While I based my opinion denying summary judgment primarily on the disputed issues of fact concerning the alleged abandonment of Tiquisate, I did not finally determine whether IRCA had standing on its other theories. UB had contended that since IRCA was not its competitor, its alleged antitrust violations were directed against others than IRCA, and that any harm to IRCA was merely of incidental effect.

6. February 16, 1961 is an important date. On that day McGovern, the sole representative of UF on the IRCA Board, died, and Sunderland of UF advised the IRCA Directors that UF would not nominate anyone to the IRCA Board.

February 16, 1961 also became the date on which the statute of limitations ran on the antitrust claims, because this federal action was filed on February 16, 1965, exactly four years later.

890

On the trial, resourceful counsel for the plaintiff did not limit their antitrust claim to the Tiquisate abandonment and its consequences. Instead, they have sought to take full advantage of the decision of our Court of Appeals that they had not split their cause of action.

Accordingly, they have contended that UF was in a conspiracy with its subsidiary, CAG, to restrain trade for many years—going back a half century—and that some of this restraint continued into the period after February 16, 1961. They also contend that certain acts committed before February 16, 1961 had an effect after that date because the damages were allegedly not calculable at any time before the statute had run. The plaintiffs contend that such damages are recoverable despite the claimed bar of the statute under the doctrine of *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

The defendant takes sharp issue on these claims, urging that conditions of alleged control and domination had so changed by 1961 that no carryover of antitrust violation (if it ever existed) can be presumed and that the plaintiff has failed to prove such control and domination. It asserts further that *Zenith, supra,* has no bearing because, in any event, there were no pre-1961 damages that were incalculable at the time and have become calculable since. It contends also that the plaintiff has failed to show any causal connection between any pre-1961 act and an impact therefrom after February 16, 1961.

### Changes in Relationship

With the statutory limitation of February 16, 1961 in mind, let us review the changes that had occurred by that date

in the relationship of UF to CAG to IRCA. I noted in the earlier opinion, 358 F.Supp. at 1367, that the New York Court of Appeals had affirmed the Referee's decision requiring UF to pay higher rates to IRCA for transportation of bananas, $130 per car, a rate equal to that charged its competitors in 1960; and that the United States had obtained a consent decree against UF in 1958, one section of which required UF to dispose of its IRCA stock not later than June 30, 1966. Judge Ryan had found, and our Court of Appeals did not disagree, that since 1959 IRCA had had several independent directors who had the requisite knowledge to bring suit against UF for antitrust violations.[7]

By February 16, 1961 the control of IRCA by UF had been dissipated. While it still owned the IRCA stock which was not sold until January, 1962, it was required under the consent decree to divest itself of the IRCA stock by 1966. I find that the IRCA board was independent of UF by February 16, 1961. At the May, 1961 IRCA stockholders' meeting, UF did not vote its shares. The freight rates on banana transportation were governed by the *Ripley* judgment.

The consent decree, in Paragraph VI(A)(9), prohibited contracts between UF and IRCA requiring IRCA to discriminate against other shippers. Counsel for IRCA, UF and the *Ripley* plaintiffs independently studied the contracts and found no language requiring discrimination that should be abrogated.[8] We shall deal later with the claim that IRCA *in fact* was compelled to discriminate against Standard Fruit ("Standard"), UF's only competitor in Guatemala.

---

7. The finding related to the claim of plaintiff that the statute of limitations had been tolled because the potential defendant controlled the IRCA Board.

As early as July, 1957, after Judge Hammer's decision in *Ripley*, UF sought to have IRCA call a special meeting of its stockholders to modify the contracts, but apparently IRCA was, by then, independent enough to

refuse UF's request, and the meeting was not called.

8. The specific section of the contracts with IRCA which prohibited IRCA from encouraging competition with UF was eliminated under the consent decree. (DX 73–75).

The conclusion of counsel that there were no clauses requiring IRCA to discriminate would have had to be wrong if "discrimination" actually continued, since, if the contracts themselves did not require it, there was no proof adduced that the IRCA board was subservient enough in the statutory recovery period to take orders from UF or CAG. On the contrary, since we know from Judge Ryan's finding that there had been at least three independent directors since 1959, one would expect to find any discriminatory act of the IRCA Board resulting from domination by UF to have met with their articulated dissent. The IRCA Board Minutes are in evidence (DX 552) but they show no instance of a split vote on rates or practices.

### The Factual Issues

Among the factual matters to explore on the antitrust phase of the case are, therefore, (A) whether UF caused IRCA to discriminate against UF's competitors or potential competitors to the detriment of IRCA and (B) whether Tiquisate's termination (and its operation in the statutory period) were for the purpose of suppressing competition in the import of bananas into the United States and to harm IRCA in reprisal for *Ripley*; or whether, as the defendant contends, the termination as well as the operation of Tiquisate were dictated by legitimate business considerations.

A. *Alleged discrimination against other shippers and potential shippers*

The gravamen of the *Ripley* complaint was that UF had breached its fiduciary duty to IRCA by insisting upon a large differential in the freight rate for banana shipments on the line haul from the west coast to Puerto Barrios between that which was charged to UF and that which was charged to competitors, to the great advantage of UF and to the detriment of IRCA.

In this case, the plaintiff is not claiming any discrimination in the *rates* paid on the line haul after February 16, 1961 (P. Answering Memo "PAM" p. 111).[9] There is good reason for this concession.[10] The line haul rates were fixed for the period from 1956 to the end of the contract by the *Ripley* court and complied with by the defendant. I have previously found the termination date of the contract involved to have been January 1, 1963.

The claim, in this respect, reduces itself to claims (1) that alleged discrimination in rates before February 16, 1961 had injurious effects after 1961 and is compensable; (2) that certain other discriminatory charges, other than the line haul freight rate itself, continued as discriminatory action after February 16, 1961. These alleged discriminations are: (1) dock charges; (2) total banana transportation costs; (3) import line haul rates; (4) wharfage on imports; (5) diesel oil freight rates; (6) practices at the pier; (7) allocation of banana cars. These very claims were essentially before the *Ripley* court on claims of unfairness. That court did not require any of the practices involved to be changed or compensated for.

With respect to these claims of discrimination in favor of UF against its competition, I find the following facts:

### 1. Dock charges

█ Both before and after 1961 CAG paid no wharfage charges to IRCA (which owned the wharf). CAG loaded

9. The parties have favored the court with over 1,000 pages of argumentative briefs plus proposed findings. They will be referred to as follows: P's memo of law—P. M.; D's post-trial brief—D. Br.; P's Answering Memo—PAM; D's response—D.R.; P's Memo Reply—PMR; D's Reply Brief —D.R.B.

10. Judge Friendly had noted: "Moreover, the second claim may have scant practical application to that relatively recent period [after February 16, 1961] in view of the provisions for rate increases in the *Ripley* judgment." 373 F.2d at 417.

and unloaded its ships at Barrios with its own labor. Standard, its competitor, was required to pay IRCA for the loading and unloading operations a wharfage fee of $3 per ton and a fee computed from the cost of IRCA's loading crews (Tr. 73; 313). The plaintiff failed to call any of Standard's personnel as a witness.

The plaintiff has failed to prove that it did not cost CAG as much to load and unload as the charge paid by Standard to IRCA for handling these operations. There is also no proof that Standard was arbitrarily denied, at the behest of CAG, the right to use its own labor in the process. There is evidence that Standard discussed this matter with IRCA in 1957. On July 2, 1957 the IRCA Board adopted a resolution to advise Standard that IRCA would agree to eliminate wharfage and switching charges if satisfactory arrangements could be made with Standard's labor to take over the unloading. Nothing came of the suggestion for reasons not in evidence.

On March 15, 1961, by which time I find that the IRCA Board was independent of the defendant, the board was informed that Standard wanted a cancellation of the wharfage charge on export banana traffic. Again there is no evidence that anything further was done about it before Standard left Guatemala entirely as the result of a hurricane "blowdown" of its west coast plantations in November, 1961. Nor is there any evidence that UF had anything to do with the decision, whatever it may have been. I find that there is no evidence of discrimination on the wharfage charge. I find further that it was essentially a loading and unloading charge rather than a separate charge for the use of the pier apart from its connection with the loading and unloading services performed by IRCA.

### 2. Total banana transportation costs

■ Standard was in business in Guatemala after February 16, 1961, but only until November of that year. During that period, as we have seen, UF was required under the *Ripley* judgment to pay the public tariff rates, which it did. Though the freight rate paid by both shippers was the same, the plaintiff contends that there was, nonetheless, a differential in favor of UF over Standard, because UF's so-called "bannana loading expense" at Barrios for 1961 was $34.04 per car (DX 536) while Standard was paying IRCA $36 per car wharfage "plus at least $10 for loading aboard ship" (Tr. 424). Standard also had unspecified expense in running its own conveyors at Barrios (Tr. 157–60).

On the other hand, I find that IRCA rendered "spotting services" to Standard —spotting its empty banana cars at locations on its banana farm (Tr. 1339–40) while CAG spotted its own cars at its own expense and turned their cars over to IRCA only at the junction at Rio Bravo. CAG operated its own 90 mile railway which it maintained and operated with its own locomotives and crews (Tr. 1338–39). Moreover, the line haul for Standard was 70 miles more each way than for CAG. I find that the differential claimed by plaintiff is not supported by adequate proof in view of the fact that IRCA rendered greater services to Standard than to CAG. Plaintiff has failed adequately to establish these extra costs to CAG which would have to be part of the equation to make both sides equal.

### 3. Import line haul rates

The plaintiff contended that there was discrimination in freight rates going the other way—on *imports* to the west coast. Plaintiff concedes that there was no such discrimination in the statutory recovery period. (PAM 117–118).

### 4. Wharfage on imports

■ Under its contract CAG was required to "pay wharfage at the rate of $1.00 per ton in the case of import freight other than that which is for sale in the Company's stores which will be

charged at $3.00 per ton" (PX 901, p. 1). In any event, as plaintiff concedes "The only year in the statutory recovery period in which Standard was also importing materials was 1961" (PAM 119). There is no documentary proof of wharfage charges paid by others.

The testimony of Haase, president of IRCA, that the published tariff rate was higher than CAG's special contract rate (Tr. 89; PAM 119) is not specific enough regarding applicable time periods to apply to the period from February 16, 1961 to November, 1961 when Standard ceased operations in Guatemala after a hurricane (Tr. 72; 212).

### 5. Diesel oil freight rates

█ Plaintiff claims that there was discrimination on the freight rate that IRCA charged CAG for transporting diesel oil. There is no evidence of whether the quantity of diesel oil imported by Standard on the east coast and shipped to the west coast in the nine months of the statutory recovery period was of any significant amount. So far as the record shows, none may have been imported in the period in question. In any event, Haase, the only witness on the subject, was unable to point to the particular years when a differential existed (Tr. 388–89).

### 6. Practices at the pier

█ The IRCA pier at Puerto Barrios was used by both UF and Standard. UF used the north side of the pier where it had conveyors for loading and unloading its ships. Standard generally used the south side of the pier where it had placed its conveyors on an apron. Again we are talking only of the nine months during the statutory recovery period.

UF had installed its conveyors on the north side of the pier many years before Standard came to Guatemala. It should be noted that cargos other than bananas used other parts of the pier to avoid interference (Tr. 82).

Plaintiff contends that it was discriminatory for UF to have the north side of the pier, where the water was several feet deeper and could accommodate larger vessels, for itself. I find that there is no evidence that the ships used by Standard were too small for its purposes or that Standard ever asked for the privilege of using the north side of the pier. In the absence of any such evidence, the claim that the pier was used in discriminatory fashion during the statutory recovery period is sheer speculation.

### 7. Allocation of banana cars

██ There is no doubt that CAG was given preferential treatment over Standard in the transportation of bananas from the west coast (Tr. 351). The plaintiff, however, does not complain "that IRCA suffered any damages on shipments made by Standard but that Standard's capacity to ship from Western Guatemala was not fully developed because of United's [UF's] anti-competitive and monopolistic practices." (PAM 125).

According to Haase, banana cars were apportioned to CAG on a preferential basis in the years 1960 and 1961 (Tr. 69–72). He conceded, however, that the allocation of banana cars never caused Standard to miss a ship or a cutting and that the delay never exceeded 48 hours (Tr. 345–48). This does not evidence a horrendous situation where Standard simply could not plant and ship more bananas because of a shortage of banana cars. Haase believed that neither IRCA nor Standard ever suffered losses as a result of car allocations (Tr. 345–46; 411–12).

With respect to injury to the plaintiff, such evidence, if it existed, would relate not only to damages but to the question of injury itself. Without injury there could, at the threshold, be no standing to recover. See GAF Corp. v. Circle Floor Co., 463 F.2d 752 (2 Cir. 1972), and the discussion on summary judgment in this case at 358 F.Supp. 1369–73. It is, thus,

my conclusion that so far as the statutory recovery period is concerned, there was no "continuing" discrimination into that period resulting either from (1) prior domination of IRCA by UF or from (2) contract provisions that survived into the statutory recovery period.

As the plaintiff properly suggests, "whether IRCA incurred injury after February 16, 1961 as a *proximate* result of United's [UF's] violations is, of course, a question of fact, e. g., *Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 323 [91 S.Ct. 795, 28 L. Ed.2d 77]; *Highland Supply Corp. v. Reynolds Metal[s] Co.*, 327 F.2d 725, 734 (C.A. 8)" (P.M. 45). (Emphasis added).

We shall consider whether there were violations of the antitrust laws which were not calculable in damages before 1961 but which became calculable in the statutory recovery period, after we consider the claims based on the abandonment of Tiquisate.

B. *Alleged termination and operation of Tiquisate for purpose of suppressing competition in import of bananas to the United States and to harm IRCA in reprisal for* Ripley

■■ The Tiquisate banana growing operation was closed down in 1964 and the land sold by CAG. It is plaintiff's claim that this Western Guatemala operation was closed down in reprisal for IRCA's refusal to lower the freight rate set by the New York courts as a "fair rate" and that when the land was sold it was deliberately kept from banana cultivation in order to suppress competition in the import of bananas into the United States and as further reprisal against IRCA for its obstinate refusal to reduce the rates.

It was primarily to enable the plaintiff to come forward with proof on these allegations that summary judgment for the defendants was denied.

The proof at the trial included testimony of Haase, former president of IRCA, and of Sunderland, former president of UF, as well as Van Diepen, Mason, and Fox, former officials of UF and CAG.

In addition, numerous exhibits were allowed in evidence. Each party has submitted proposed findings of fact, including findings related to the third claim.

Assuming, arguendo, that the relevant market for purposes of Section 2 of the Sherman Act is the importation of bananas into the United States solely from Guatemala, we must limn the scene as it existed in the early part of 1961 and shortly before.

The essential ingredients were: (1) CAG was now paying the freight rates on the long haul from Tiquisate to Barrios as ordered by the New York courts; (2) Sunderland had come to UF as President in November, 1959 (Tr. 662); (3) UF's earnings from its banana operations had declined from $58.6 million a year in 1950 to $7.2 million in 1959 (DX 135; Tr. 713–14); (4) a large element in the deterioration of the banana growing operation in Tiquisate was the spread of Panama disease which attacked the roots of banana plants and killed them (Tr. 670); areas infected with Panama disease had to be abandoned so far as cultivation of the common Gros Michel or Cocos type of banana was concerned (Tr. 1312); (5) another large element was the prevalence of "blowdowns," tropical storms which destroyed vast areas of Gros Michel plantings; (6) competition from Ecuador was increasing; (7) Sunderland was required to find a solution to the economic difficulties of the company as a whole.

Alongside these problems were two other considerations: (1) UF did not like the rate set by the *Ripley* court and maintained that it could not live with it and (2) the contract with IRCA, as the defendants read it and as this Court later concluded, 358 F.Supp. at 1374–76, was to expire on December 31, 1962, at which time a renegotiation of rates would be in order.

Such a renegotiation never actually got off the ground. Though UF pressed it several times, IRCA took the position, unwisely as it turned out, that the contract did not expire until December 31, 1967, that the contract stood under the *Ripley* judgment, and that it would not lower the rate set by the *Ripley* court.

IRCA's refusal to lower the rate was in the face of clear intimations by UF, as plaintiff has shown, that, as an alternative, the defendants might have to discontinue the Tiquisate operation. I find that there was no promise that if the rates were lowered satisfactorily Tiquisate would be continued indefinitely as a banana operation. IRCA was made aware of the natural problems of Tiquisate, excessive Panama disease, excessive blowdowns, and the special problems of the banana ripening process in the long haul from Tiquisate to the Atlantic Seaboard.

IRCA knew that serious decisions would have to be made about Tiquisate, but it refused to budge. The parties were, of course, inhibited before December 1, 1960 when the New York Court of Appeals rendered its decision, and, indeed, to February 23, 1961 when that court finally denied rehearing.

But, thereafter, by its inaction, IRCA made it evident that Sunderland would have to consider the freight rate set in the *Ripley* decision as an element in his final recommendation on Tiquisate. It is possible that if IRCA had been alert, as it should have been, to the obvious danger of its best customer leaving Guatemala, the negotiations for new rates would not have proceeded in such desultory fashion. Perhaps it was because IRCA was itself a monopoly, armed with a judicial decree on rates, that it assumed a position of power which it did not really possess. Great empires have been lost, and probably will be again, through miscalculation of one's own strength or adversary's weakness. I realize that the plaintiff can hardly be expected to adduce direct evidence on intention, even by way of binding contemporaneous memoranda, and that it must rely largely on circumstantial evidence. I have taken that into consideration in evaluating the evidence and sought inferences from such evidence, as far as I conscientiously could, in favor of the plaintiff. On the other hand, the burden of establishing its case by a preponderance of the evidence rests on the plaintiff.

I have concluded that the plaintiff has failed to sustain that burden. The findings of fact establish that; but I think it may be appropriate to suggest the broad elements of that conclusion, perhaps somewhat discursively.

I recognize that it is possible that all the testimony and documentary evidence presented by the defendants in support of their position that Tiquisate was closed for legitimate business reasons could have been for the purpose of fabricating a fictitious excuse for the ultimate decision, as the plaintiff appears to contend. I must say, however, that I was impressed with the sincerity of Mr. Sunderland and the other UF witnesses. They testified lucidly about the difficult problems they were facing in the 1959–1964 periods, difficulties which arose independently of the *Ripley* lawsuit. In general, I credit their testimony as supporting the legitimate motive in abandoning the Tiquisate operation in favor of other operations in other countries and in Eastern Guatemala.

Enough has been shown about the hazards of banana growing in the tropics to enable the court to follow the course of decision taken by Sunderland and his board. By way of general synopsis, I have found that the very period which coincided with the affirmance of the *Ripley* judgment ushered in a new era in banana cultivation. In essence, the struggle was against the forces of nature rather than against the *Ripley* court.

The conventional banana was the Gros Michel which had been devastated by Panama disease and blowdowns (because of the height of the plant, making it more susceptible to wind damage). Sunderland, faced with a natural crisis,

ordered detailed agronomic and financial studies to be made. If these studies coincided roughly with the affirmance of the *Ripley* judgment, they also coincided with the new presidency of Sunderland.

These studies showed that the solution was the development of a banana that would be resistant to Panama disease and would also grow shorter and be less susceptible to tropical windstorms. Ultimately, such a plant was successfully developed. It was called the Valery banana. The basic weaknesses were small compared to its strengths. It was thin-skinned and had to be boxed before being transported. There was some doubt whether it could withstand long hauls up mountains and down valleys.

A significant counter-strength of the Valery was that it required less land for its cultivation than did the Gros Michel. This, in turn, led to the logical question of whether UF had too much land for present need, and, if so, in what areas land should be sold.

A sharp controversy has arisen between the parties on this question. UF has presented a mass of agronomic and financial evidence to establish that Tiquisate was a logical area to drop when the Valery banana came to the rescue of the Company because it was the worst of all UF's company-owned divisions in which to produce the Valery bananas. The Company also dropped other areas (Tr. 802, 869–70). Of the 1.36 million acres owned by the Company at the end of 1961, approximately one-third, or 422,701 acres, were authorized for sale and disposal in twelve divisions (DX 530).

Aside from the agronomic and financial reasons, I also credit the political reason given, that the political climate in Guatemala was bad, and that if land had to be disposed of, it would be safer not to have two major divisions, Eastern Guatemala and Western Guatemala, in that same country.

The plaintiff urges that it can be shown objectively that Tiquisate was not the worst division for growing the Valery. It has developed figures on landed cost to U.S. Gulf ports for boxed bananas. Its assumptions on the decreased costs for boxed bananas were challenged by Mr. Fox, the UF executive vice-president. But assuming that plaintiff's landed cost figures were accurate, there is no showing that Sunderland knew this, agreed with it, or had reason to doubt the Miller Report which showed Tiquisate to be the worst division. The plaintiff, to prevail on the issue of intent, would have to convince the court that the Miller Report and the other reports were contrived to reach a result. I am not convinced of that. I think the testimony concerning action taken on the basis of the reports was straightforward.

We are not in a situation where the objectively best division was reported as the worst. In short, I find no accumulation of circumstantial evidence preponderant enough to overcome the testimony and exhibits supporting the actions concerning Tiquisate as motivated by legitimate need and not by the *Ripley* judgment alone.

If the dominant purpose of UF had been to eliminate competition, it is paradoxical that its successive step decisions to abandon Tiquisate growing came mostly after its *only* competitor, Standard, left Guatemala in November, 1961. CAG did not get below about 50,000 acres of banana land until October 23, 1962 when it authorized the sale of 28,104 acres. This was about a year after Standard had left the country, apparently forever.

The Managers' Conference of September 4 and 5, 1962 was when it was decided to "phase out" the Tiquisate operation. This was almost a year after Standard left.

One must conclude that in seeking a lower rate for banana shipments, UF was not seeking a rate that was discriminatory, for there was no longer any actual competitor to discriminate against.

The next contention of the plaintiff, as I understood it, was that in selling

the Tiquisate land, UF deliberately restricted it from future banana cultivation, for the purpose of limiting its banana competition and as reprisal against IRCA. In denying summary judgment I wanted to give plaintiff a chance to prove these allegations. It has failed to do so, although its able counsel has been most ingenious in his efforts to do so.

Having determined that the closing of Tiquisate was legitimately motivated, we next come to the question of whether in the disposal of the land it acted in furtherance of monopolization. I leave to one side the question of whether UF by the 1960's was a monopoly or close to a monopoly, and assume, for the moment, that it was.

The first question is whether, in the deeds given to purchasers, there was a restrictive covenant prohibiting the use of the land for banana cultivation. There was no general policy, although there were a few leases with such restriction. Second, were good faith efforts made to sell the land for banana cultivation? I find that the buyer's market was very small for the following reasons. The logical buyer, if, indeed, it wanted to go back to Western Guatemala after its blowdown experience of 1961, was Standard Fruit. But that was the one buyer, UF's largest competitor, to whom UF was not permitted under the Consent Decree to sell divested land. The Government of Guatemala was not enthusiastic about bananas as the staple of its agriculture, as evidenced by the circumstance that it had ceased the cultivation of the 100,000 acres of banana land that UF had ceded to it some years before. This policy also tended to eliminate small landowners who could not count on Government support, which was more directed to the growing of cotton. Other active competitors in the banana business were in fact approached, and registered lack of interest either for agronomic reasons or because of a lack of capital to finance the large operation.

Finally, the plaintiff rests its principal argument that UF could have pre-served Tiquisate as banana growing land on the suggestion that it could have made a deal with Roy O. Chalk, an entrepreneur, who in 1963 controlled IRCA. It is a popular adage that it takes two to tango. I find that Chalk was a reluctant dancing partner.

If there had been an offer from Chalk which the court could have found reasonable, there might have been an objective finding that a rejection by UF was ulterior in motive. Or if there had been affirmative misrepresentations to Chalk, such as one finds in a Rule 10b–5 case, the same result might have been reached.

The difficulty here was that Chalk, for his own good and no doubt honest reasons, was slippery in the negotiations. He wanted to buy cheap and that was his privilege. UF might, indeed, have been expected to bend a little to save the banana growing business, but the question is how much is enough. What Chalk wanted I find was unreasonable. Assuming that he was sincerely interested in making a deal, which one will never know, he apparently wanted to buy the Tiquisate land at $100 an acre (the upset price), get the equipment and plant for nothing, and buy it as a divestiture under the consent decree which would also require UF to sell him the appurtenances needed for a going business including a steamship fleet worth $5 million. He did not come up either with a total price or a means of independent financing. Under the antitrust consent decree it is doubtful whether the Department of Justice would have permitted UF to divest under the decree by taking back a substantial purchase money mortgage.

I find that the Chalk deal was remote rather than close and that the deterioration of the Chalk negotiations, as indicated by the findings of fact, were not the result of footdragging by UF.

Once the decision to close down Tiquisate was made it would have been quixotic to hold the land for a longer time in the extremely remote hope that

someone would appear as a purchaser for banana cultivation.

Yet, there is the last argument that, even if UF was not discriminating against the American public by monopolization or against Standard and other competitors, it still intended simply to break IRCA in reprisal for *Ripley*.

On the facts, we have seen that predominant legitimate motives prompted the liquidation of Tiquisate. The motive of reprisal is, thus, contra-indicated. But since the plaintiff presses the point, though he has failed to prove it, perhaps another word should be said on the question of a singleminded intent to destroy IRCA.

I wonder what motive a businessman would have to destroy another business which was not a competitor when he had not even the intention to go back to that market after the victim's body was buried. Revenge, in the pure form suggested by counsel for the plaintiff, is not in the vocabulary of business. While Adam Smith and Ricardo may have oversimplified things, it is still a truism that business corporations are economic animals with a lust for profit. It is a large assumption, indeed, that they would be subject to the petty revenges of princelings. To drive even a competitor out of business would mean that the driver hoped at least to move toward a monopoly market after the debacle. To destroy a railroad just to hurt it is hardly a game played by sane men. It would be something like the act of kicking an inanimate object after one has stumbled over it. (See Holmes, *The Common Law*, pp. 11–12).

In substance, then, I find that the plaintiff has failed to prove its antitrust claims under the Third Claim, the findings leading to the conclusion having been detailed in the Findings of Fact filed herewith.

*Sixth Claim: Clayton Act § 7*

The plaintiff contends that the acquisition of stock by UF in IRCA in 1928 and 1936 was in violation of Section 7 of the Clayton Act and that its effect was to restrain commerce to the injury of IRCA.[11]

There is no doubt that a vertical acquisition, as well as a horizontal acquisition, may violate Section 7. *United*

---

11. Section 7 (15 U.S.C. § 18) provided in pertinent part, prior to 1950:

"Sec. 7: That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce.

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of two or more corporations engaged in commerce where the effect of such acquisition, or the use of such stock by the voting or granting of proxies or otherwise, may be to substantially lessen competition between such corporations, or any of them, whose stock or other share capital is so acquired, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

In 1950, it was amended to read as follows:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more corporations engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly."

*States v. E. I. DuPont de Nemours & Co.,* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed. 2d 1057 (1957). It is also settled that money damages as well as injunctive relief may be predicated on a Section 7 violation. *Gottesman v. General Motors Corp.,* 414 F.2d 956, 960–61 (2 Cir. 1969). The difficulty here is that Section 7 speaks principally to the future. It was intended largely to nip in the bud incipient dangers of lessening competition, restraint of commerce or a tendency to monopoly.

This action was brought thirty-seven years after the original stock acquisition. And while impact within the period of limitations is enough to invoke jurisdiction, the threat of competition is measured *at the time of suit. United States v. E. I. DuPont de Nemours & Co., supra,* 353 U.S. at 607, 77 S.Ct. at 884. This action was begun in 1965. UF had already sold its stock in 1962. At the time of the suit there was no possibility of a tendency to limit competition or to monopolize by reason of the stock acquisition.

### General Conclusions

In the opinion denying summary judgment for the defendants I noted that "[w]e must assume on this motion that until all the facts are in, we cannot determine whether policy based on precedent will support the standing of the plaintiff to sue." 358 F.Supp. at 1373.

The facts are now all in. In determining the motion for summary judgment, the Court concentrated on whether acts committed *after* the statutory period as determined by the Court of Appeals, 373 F.2d 408, could give the plaintiff standing to sue for the alleged antitrust violations. In view of the limitations period set by the appellate court, neither side pressed strongly the question of whether there were acts committed *before* the statutory period which caused injury within the statutory period. It was not important to consider this question separately since summary judgment was denied in any event. The decision turned on whether standing could be denied on summary judgment. The issue of proximate cause was considered only in relation to standing. The plaintiff did not rely on *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* in support of a claim of antitrust violations in an early pre-statutory period that would support injury in the statutory period.

It does so now. Plaintiff now contends that antitrust violations occurred before February 1961, but which were not sufficiently clear as future damages to permit proof of such damages except within the statutory period.

The theory apparently is that no matter how far back the act of injury goes, it is redressible if its effect lasted into the statutory period. While, at first blush, this would seem to negate the intention of Congress in creating a four year statute of limitations for antitrust violations, the Supreme Court did carve an exception in *Zenith, supra,* for a situation where the future damages were not calculable when the violation occurred, excluding such damages from the bar of the statute of limitations. It is not clear how far the Court will go in situations going beyond the facts in *Zenith,* where the conspiracy actually continued into the statutory period.

Assuming, arguendo, that the changes wrought by the Government consent decree of 1958 and the *Ripley* judgments would not, even if they caused a prior conspiracy to stop, prevent the *Zenith* rule from applying, we must turn to whether there were antitrust violations prior to the statutory period, whether such violations, if found to exist, proximately caused the later injury in the legal sense, and whether they gave the plaintiff standing to sue (a point reserved in my earlier decision).

The Court of Appeals in sustaining the partial defense of the statute of limitations in this case said:

"But one may well question how far these policies would be furthered by a rule that would often permit the

collection of treble damages accruing over decades and thus might seem rather an overkill. Moreover, the statute of limitations itself embodies a strong policy 'to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.' *Order of R.R. Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 348, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944). There could hardly be a better case for enforcing the policy than this, where UF has already suffered two judgments for its misdeeds and recovery of damages for more than three decades would result in a huge windfall to most of the present stockholders of IRCA and an unexpected loss to many innocent ones of UF." 373 F.2d at 416 (footnotes omitted).

Judge Friendly was, of course, not thinking of the *Zenith* exception for that had yet not come down. But in analyzing the *Zenith* exception, considerations of policy may distinguish between the continuous conspiracy, as in *Zenith*, and the alleged conspiracy which had become a matter of history by the time the statutory period began.

The plaintiff contends that the contracts between IRCA and UF were of a continuing nature, that earlier contract pressures were antitrust violations, and that certain future effects were not provable until they happened.

The essence of the claimed antitrust violations is that IRCA was harmed because it was forced to operate under conditions that discouraged competitors of UF, who would have been shippers on the railroad, from growing bananas in Guatemala.

I must find that the plaintiff has failed to carry its burden of proof. One large competitor of UF, Standard, did come into Guatemala, and left, so far as

the unrefuted evidence shows, only because a "blowdown" destroyed its plantations in 1961.

The plaintiff has not shown that there ever was a single other potential competitor who indicated an interest in Guatemalan banana growing to the point of approaching IRCA to see what arrangements for shipping could be made. Nor has the plaintiff adduced any evidence that there were potential competitors who had the rather large financial means required to enter into competition with UF in growing bananas in Guatemala. See *Stearns v. Tinker & Rasor*, 252 F.2d 589, 606 (9 Cir. 1957).[12]

 An antitrust claim requires more than a theory. It is noteworthy that not only was no evidence adduced to prove the foregoing, but no official of Standard was deposed or brought to testify for the plaintiff at the trial, nor were any potential competitors deposed to prove their ability to go into Guatemala and their unwillingness to do so because of alleged restraints of trade by UF.

 As a result, the claim of injury because of conspiracy or monopolization has not been shown to be the cause, proximate or substantial, of actual injury to IRCA. To the extent that UF paid less freight charges than it should have, that was a matter of breach of fiduciary duty and has been recompensed by the *Ripley* judgments. The absence of proof of *direct* harm to competitors of UF makes *a fortiori* the absence of proof of *indirect* harm to IRCA itself.

It is necessary for a plaintiff to prove that the acts claimed to be in violation of the antitrust laws caused damage—in this instance, actually kept potential shippers out of Guatemala. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Salerno v.*

---

12. Plaintiff's reliance on the entry of independent banana importers into Ecuador is not convincing. In Ecuador a banana company could buy bananas without the large investment involved in growing them.

*American League,* 429 F.2d 1003, 1004 (2 Cir. 1970), *cert. denied,* 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971); *Bendix Corp. v. Balax, Inc.,* 471 F.2d 149, 163 (7 Cir. 1972). And such proof must show a clear causal connection by a preponderance of the evidence. *Ansul Co. v. Uniroyal, Inc.,* 306 F.Supp. 541, 567 (S.D.N.Y.1969) (Mansfield, J.), *aff'd in pertinent part,* 448 F.2d 872 (2 Cir. 1971), *cert. denied,* 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972).

No matter how sympathetic a court may be to a plaintiff as a "private attorney general," "it is uniformly held that liberality may be used in estimating the amount of damages after it has been shown that they were caused by acts contrary to the anti-trust statutes, but that this liberality does not extend to proof that the damages were caused by the illegal acts." *Dantzler v. Dictograph Products, Inc.,* 309 F.2d 326, 330 (4 Cir. 1962), *cert. denied,* 372 U.S. 970, 83 S. Ct. 1097, 10 L.Ed.2d 133 (1963).

██ Here, the "causative link" has not been proved. See *Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183, 187 (2 Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); *Kinzler v. New York Stock Exchange,* 62 F.R.D. 196, 200–01 (S.D.N.Y.1974). Accordingly, the *Zenith* rule simply does not come into play.

The failure of proof of any injury from antitrust violation makes academic a discussion of standing. But since so much effort was devoted to the question by the parties and by the court on the summary judgment motion perhaps some statement is in order.

In the summary judgment opinion I limited the discussion of standing to the limitations period—following February 16, 1961. I treated the gravamen of the claim that survived the limitations defense as the allegation that in the abandonment of Tiquisate, IRCA had become a prime target as a reprisal for the enforcement of the *Ripley* judgment. Since the *Zenith* question had not been raised I did not discuss standing *before*

the limitations period, and reserved the entire issue of standing for decision after trial. 358 F.Supp. at 1373.

In view of the outcome of the trial there is no need to decide specifically whether IRCA had standing to sue. Considering the complexity of the problem applied to these particular facts, it is better to leave further discussion of standing for another time.

██ While in the light of this decision it is not strictly necessary, I find as an alternative ground that the plaintiff has failed to prove that the loss of its property to the Guatemalan Government and its effective ouster from that country were substantially caused by the acts of UF.

The record shows abundantly that over the years the Guatemalan Government and the labor unions together caused IRCA to come upon evil days unrelated to the activities of UF.

Unfortunately for the IRCA stockholders the record is quite clear that its financial troubles come from other sources than UF.

IRCA prospered through 1957. It was the only means of transportation from the Atlantic Ocean at Puerto Barrios to Guatemala City. The communists took over in the regime of President Arbenz from 1951 to 1954, and IRCA became the target of nationalist attacks. During that period, highway construction began which ultimately parallelled the railroad routes and subjected the railroad to disastrous truck competition.

In 1955, the Government opened its own modern port at Mateas de Galvez to compete with Puerto Barrios. The new government port became the eastern terminus for the government's new highway. IRCA was denied permission to build a spur line to the new port, which also discriminated in port charges to its own benefit. Certain goods, by Government decree, were required to be shipped through the government port.

In 1958, the railroad had serious union difficulties. Over the years, those

serious labor difficulties continued. On January 3, 1968, the union started a strike because of IRCA's failure to pay a Christmas bonus in a loss year. The Government made a loan to the railroad far below its minimum capital requirements, and when the railroad was unable to meet the rigorous loan conditions, the Government foreclosed and took over the railroad in January, 1969 (PX 245).

It cannot be gainsaid that the people who bought the IRCA stock and now control it were quite familiar with the dangers involved. Judge Friendly noted in 1967 that "68% of the common stock of IRCA is owned by a recent purchaser." 373 F.2d at 416 n. 13. These purchasers must have known that elements presaging a debacle were present and that these elements were neither caused nor controlled by UF from whose ownership their IRCA stock derived.[13]

### The Contract Claim

██ ██ In the summary judgment opinion I noted that the plaintiff contends that the contract required CAG to ship substantial quantities of bananas for the life of the contract. I ruled that the contract expired January 1, 1963. I noted that the issue of whether CAG had an obligation to ship any particular volume was determined adversely to the plaintiffs' contentions by the Referee in *Ripley*. 358 F.Supp. at 1376.

It was therefore held that there was a collateral estoppel on the issue, relying in part on the New York doctrine that collateral estoppel will be applied when there has been a "free and fair opportunity" to litigate the issue. See *Schwartz v. Public Administrator*, 24

N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969).

At trial particular findings of the Referee in *Ripley* were admitted in evidence on the issue of collateral estoppel.

Thus, the Referee found that "IRCA undertook to transport all bananas tendered by CAG for transportation to Barrios from Western Guatemala with no corresponding obligation on CAG to ship any given amount of bananas over IRCA at the rates specified in the contracts." (D 101–G); PX 14, 15.

The Referee found that "IRCA was obligated to transport promptly all bananas tendered by United on the Pacific side; no obligation was imposed on United to ship any such bananas." B 360(d).

In the summary judgment opinion I held that there was collateral estoppel on the point that CAG had no obligation to ship any quantity of bananas. I concluded that the issue was open for independent consideration only for the years not covered by the *Ripley* supplemental judgment, the period following December 31, 1960. 358 F.Supp. at 1377.

Upon careful review I have concluded that my ruling was erroneous. The acceptance of the *Ripley* findings as collateral estoppel should not have been limited to the period before 1961. Since the *Ripley* finding that there was no obligation to ship on CAG's part related to a contract that did not expire until January 1, 1963, the interpretation was binding to the end of the contract.

I did note in the earlier opinion:

"It is apparent, therefore, that any claim of breach of contract involving failure to ship bananas in volume as

13. There are a number of sharply contested legal issues which the court has assumed, but only *arguendo*, in favor of the plaintiff. These include plaintiff's claims that (1) the relevant market under the Sherman Act is the "service of transportation of bananas from the western side of Guatemala to Puerto Barrios on the Atlantic side for shipment to the United States" (P. Br. 21); (2) that UF and CAG come within the in-

tercorporate conspiracy doctrine; (3) that IRCA, the acquired company, was "engaged in commerce" under Section 7 of the Clayton Act. See *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 95 S.Ct. 392, 42 L. Ed.2d 378 (1974).

In view of the factual and legal determinations after trial in favor of the defendants, it is unnecessary to decide the foregoing legal questions.

distinguished from the antitrust claim that arose before December 1960 could have been litigated in the State Court. Any claim of loss because of an allegedly insufficient volume was available as an item of damage." 358 F.Supp. at 1377.

The *Ripley* finding that there was no obligation to ship disposed of any right to damages. If the contract was unconscionable as a breach of fiduciary duty, that was fully litigated in the State Court. If treated as a simple breach of contract, the *Ripley* finding precludes a subsequent finding, on the same contract, of an implied covenant to continue to ship. The issue may not be relitigated.

Even if it were relitigated I would be constrained to find as the *Ripley* court did, that since there was no obligation there was no breach up to 1961.

The complaint against CAG alleges that defendant breached its contract "by ceasing all shipments of bananas in or about August 1964." 358 F.Supp. at 1373. Since this Court has ruled that the contract terminated January 1, 1963, the actual cessation of shipments because of the closing of Tiquisate after the contract had ended has no legal significance.

So far as the claim that gradual abandonment of Tiquisate was a breach of contract is concerned, I find that no corporate decision to close Tiquisate was taken during the years 1961 and 1962. There is evidence, which I credit, that in 1961, Mr. Sunderland on the basis of a cash flow report decided to continue Tiquisate operations at least through 1962 (DX 222; Tr. 757). The recommendation to close Tiquisate did not come until

after August 5, 1963 when a Carpenter memorandum stated why Tiquisate had become unprofitable and predicted a poor future. (DX 341; Tr. 800–02, 867–70).

There is credible evidence that maintenance of Tiquisate was kept up during the 1961–1963 period (DX 499, pp. 1–2, 14) and that the cultivations were maintained by cleaning, pruning and nitrogen fertilization, as well as aerial spraying. (DX 500, pp. 2–3).

I also find that the reduction in carloads shipped from Tiquisate from 13,693 in 1961 to 7,305 in 1962 was largely attributable to Panama disease and blowdown, including the big November, 1961 hurricane (Tr. 1244–45; DX 227). Stems shipped in 1961 were about 3.3 million, and in 1962, about 2 million. The difference of 1.3 million stems is attributable to a variety of factors. The stems shipped *per* acre in 1962 were less than in 1961, largely because of blowdowns (DX 548). There were 208 stems per acre lost by blowdown in 1962, compared with 151 in 1961. There was also a reduction in average acreage in bearing from 16,557 acres in 1961 to 14,289 in 1962. This reduction was due largely to Panama disease and to a lesser extent to blowdowns.

Accordingly, while I refused to grant summary judgment on the question of whether a gradual abandonment might legally be equivalent to an unlawful cessation of business, I find, after trial, that the plaintiff has not proved that the reduction in shipments was substantially caused by other than agronomic factors.

For all the foregoing reasons, the complaint is dismissed. Judgment will be entered for the defendants.[14]

14. The detailed findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a) are filed in the office of the Clerk of the District Court for the Southern District of New York.* To the extent that findings in this opinion are in addition to such findings they may be deemed to be incorporated in the formal findings. In the accompanying opinion United Fruit is designated as "UF" to conform with the earlier nomenclature used by the Second Circuit and by the District Court on the summary judgment motion. In the findings of fact United Fruit is referred to as "United" to follow the designation used by all parties in their respective proposed findings.

* Editor's note: These findings of fact and the conclusions of law are omitted from the published opinion.